THE GALENA AND CHICAGO UNION RAILROAD COMPANY, Appellant, *v.* JOHN C. DILL, Appellee.

APPEAL FROM COOK.

An unauthorized proposition to the president of a railroad corporation, that a person injured by a train of the company, should be sent to a hospital, is improper to go to a jury as evidence, in an action by the injured party against the company.

An act which exempts a railroad company from ringing a bell or sounding a whistle, at a road crossing, is not unconstitutional.

An omission to give a signal, by sounding a bell or whistle, is not of itself evidence of negligence.

A railroad company, and a traveler on the highway, have correlative rights, and each must use proper caution where there is danger of a conflict. Neither has a superior right, except as it results from the difficulties and necessities of the case.

THIS was an action on the case brought by Dill, against the appellant, in the Kane Circuit Court, but by change of venue the cause was tried in the Cook Circuit Court.

The declaration alleges that in June, 1854, the appellant being a body corporate, was the owner of a railway, which it operated, and across which there was a common highway, leading from the town of Geneva to Elgin, in the county of Kane, and used as such; that Dill, accompanied by a lady, was driving a pair of horses and buggy along said highway, and in the act of crossing said railway with all reasonable care, diligence and speed, when a locomotive, with a train of passenger cars attached, directed and managed by the servants of appellant, approached said highway without the knowledge of Dill; that it was the duty of the appellant to ring a bell, or blow a whistle attached to the locomotive, at least eighty rods before the locomotive and train of cars should reach said crossing of the highway, and that it also became the duty of the appellant to slacken the speed of the locomotive and train, and approach said highway slowly and cautiously; and that appellant so carelessly conducted the said locomotive and train, on its approach to and crossing of said highway, by not slackening speed, and by giving warning as aforesaid, nor otherwise, of the approach of said train of cars, to said Dill, while he was driving across said highway, that the buggy was struck and destroyed, and "that then and there, with all the power and violence of a locomotive and train thereto attached, forced and threw Dill fifty feet in height from the buggy, from which height he fell upon the cars attached, upon which he was carried forty rods, etc.," whereby he was greatly injured, and had his mental faculties impaired; that he has been sick and languishing from thence hitherto, etc. That Dill has been forced to pay five hundred dollars to the owners of the buggy, from whom he hired the same. That he has paid three hundred dollars for his board, nursing, etc., until the commencement of the suit, and five hundred dollars for services of physicians, nurses, etc.

Damages laid at twenty thousand dollars.

Plea of not guilty and joinder.

There was a trial by jury, MANIERRE, judge, presiding, and a verdict for $15,500. The judge of the Circuit Court ordered

a remittitur of three thousand dollars, which the plaintiff below consented to, and thereupon the motion for a new trial, which had been entered, was denied by the court. The defendant in the court below, brings the case to this court by appeal.

On the trial of this cause, the plaintiff below gave in evidence the following:

Testimony of *Elijah Wilcox*: Resides at Elgin; was about the twenty-third of December, eighteen hundred and fifty-four, on the train from Elgin to Chicago; the train ran over a carriage, with a gentleman and lady, two miles east of Clinton, near Mr. Wheeler's house, this side of Elgin. The man in the carriage was a stranger to me, they called his name Dill. The train was going west, the carriage very nearly north. We stayed at this point on account of the accident about half an hour. The first I saw, was the horses cleared from the carriage, running towards Mr. Wheeler's; I went forward and saw the man, and got him into the cars or train.

The plaintiff was insensible, almost lifeless, apparently so.

I did not suppose he would live to get to Elgin. He was injured about the head and shoulders, and his leg was cut; no bones broken or fractured. I thought the head was the worst injured. Had never seen him before.

Was in the cars when the accident happened. Did not leave my seat until car was about stopping. We were running at pretty good speed. Don't know whether train was behind time or not; had not heard any agent of the company say that the train was behind time.

The road upon which Dill traveled, has been a public highway since 1839.

The road has been repaired and kept open. The road went from St. Charles to Elgin.

The train was running pretty fast; it was a down grade. Did not hear any signal before they approached the crossing. Heard a whistle or bell at the time of crossing, or soon after. Can't say whether it was a bell or whistle; it was one or the other. The collision was just about the time I heard the sounds.

There was something startled us all. I was informed very soon after the collision of what had taken place. The crossing could be seen quite a distance; I should think two miles, perhaps more. There was no obstruction between the railroad track and crossing. The plaintiff was in a top buggy.

On the highway there may be a few scattering trees. The wagon road is a little higher than the railroad; no cut in the railroad before it approaches the crossing. Dill was carried from fifteen to twenty rods from the crossing. The buggy was com-

pletely demolished, broken all to pieces. The train passed beyond the wagon road, and then backed up to the crossing.

Plaintiff also introduced as a witness, C. B. Dodson, who testified he knew Dill, and said: I saw Mr. Turner, the president of the railroad company, and related the circumstances as I had heard them talked about. I suggested to him that Dill was destitute and had no friends, and that I desired the company to send him to the hospital. Captain Turner said he could do nothing for him. Mr. Dodson, the witness, said that he did not go to Mr. Turner at the instance of the plaintiff, or any one in particular, and that Dill did not know of his going. To the admission of which testimony the defendant's counsel objected, but the court overruled the objection; to which ruling of the court in permitting said testimony to be given to the jury, the defendant excepted.

The following errors are assigned:

The court permitted improper evidence to be given on the part of the plaintiff in the court below.

The Circuit Court gave improper instructions on the part of the plaintiff.

The Circuit Court improperly overruled the motion for a new trial.

The Circuit Court should have set aside the verdict, because the verdict was contrary to law and evidence, and because the damages were excessive.

E. Peck, for Appellant.

B. F. Fridley, and R. S. Blackwell, for Appellee.

Walker, J. It is assigned as error, that the court below admitted improper evidence on the part of appellee. And in their brief, appellants insist that Dodson's conversation with the president of the road, in reference to sending appellee to a hospital was irrelevant and impertinent to the issue, and should have been rejected. We are at a loss to see for what purpose it was admissible. Dodson says he was unauthorized by any person, to propose that appellee should be sent to the hospital, and it was unknown to him. By what means the parties are to become liable by propositions made without any authority, by a stranger to the whole transaction, we are unable to perceive. And even if Dodson had been authorized to make such a proposition, if it was not designed as an offer of a compromise, or as a satisfaction of damages either in whole or in part, the road could have acquired no right by acceding to it, not even the right to set off expenses incurred in procuring his admission to

a hospital, or any that might have been paid for keeping him while there. It is not imposed as any part of the duty of this railroad company, that their agents or officers shall procure admission to a hospital, for persons injured by operating their road. This conversation does not appear from the evidence, to have been a part of the *res gesta.* And if the appeal was made to the president on the grounds of philanthropy, he was only under the same obligation as any other citizen, and was free to act or not as his feelings might dictate. If it was offered for the purpose of showing malice, we find no other evidence tending to show any bad feeling between the president and appellee, or immediately connecting the president with the collision, and the mere fact that a proposition was made by a stranger to both parties, that appellee should be sent to a hospital, and the reply that the road could do nothing in that matter, does not establish malice on the part of the officers of the road. But in no point of view do we see that this evidence was legitimate for any purpose on the trial. It may not have misled the jury, but even if it did not, it was not pertinent to the issue, and therefore should have been rejected.

The appellee asked, and the court gave to the jury, this instruction: " That if the jury believe, from the evidence, that the plaintiff was free from negligence on his part, in approaching and attempting to cross the track, and that the defendant by reason of any negligence, either in running over the crossing in question, at a greater speed than is usual, and was proper, or in not ringing the bell, or sounding the whistle of the locomotive, within a reasonable distance from the crossing of the highway, upon which the plaintiff was traveling,—if the jury find such facts from the evidence, this is sufficient to charge the defendant, and the jury will find a verdict for the plaintiff and assess his damages." This instruction asserts as a legal proposition that it was a duty imposed by law upon the railroad company, to ring the bell or sound the whistle of the locomotive, and for a failure to do so, it was liable for the injury sustained by appellee, if he was free from fault on his part.

The act of the legislature of the 25th of February, 1854, (Sess. Laws, 165,) amendatory of its charter, contains this provision: " It is hereby declared and enacted, that the thirty-eighth section of an act, entitled ' An act to provide for a general system of railroad incorporations,' approved November 5, 1849, does not and shall not extend to, or control the charter or franchises of the act hereby amended." The thirty-eighth section referred to in this provision, is this: " A bell of at least thirty pounds weight, or a steam whistle, shall be placed on each locomotive engine, and shall be rung or whistled at the distance

of at least eighty rods from the place where the said road shall cross any other road or street, and be kept ringing or whistling until it shall have crossed said road or street, under a penalty of fifty dollars for every neglect, to be paid by the corporation owning the railroad, one-half thereof to go to the informer, and the other half to the State, and also to be liable for all damages which shall be sustained by any person by reason of such neglect." That it was the intention of the legislature by the act of 1854, to release this incorporation from an observance of the provisions of this section, is too plain to admit of any doubt. The language employed is too unequivocal to admit of construction. It is a familiar rule of construction, that the use of negative words in a statute, renders its requirements imperative, and those employed in this statute, are of that character, and it would be a perversion of the rules of interpretation, and of language, to give to it any other meaning, than that appellant should not be required to comply with its provisions, and to release them from all liability for its non-observance.

But it is urged, that this act of 25th February, 1854, is unconstitutional, inasmuch as it exempts appellants, from a compliance with a portion of the duties imposed upon all other similar incorporations in the State. That the protection of the traveling public from injury, and in the enjoyment of their right of transit, by private or public conveyance, is such a police power as is incident to, and may be exercised by the legislature, will be readily conceded. And whether such regulation apply to travel on public highways, by railway or by water navigation, can make no difference in its exercise. The object being to insure the safety of individuals from injury and loss, it may be exercised in such manner as the legislature may deem most expedient. Whether its regulations shall embrace all of these modes of travel, or only a portion of them, all of the carriers of travelers by each mode, or only a portion, is a question for the legislature alone to determine, in the exercise of its power. They may apply proper police regulations to one highway or railway and exempt all others from its operation, or they may apply it to all highways or railways, and exempt one or more from its operation, if they choose. The power of adopting police regulations for the protection of its citizens, is inherent to government and it may do so in any manner, not prohibited by the fundamental law of its creation. And there is no such prohibition upon our legislature, as will render this enactment void. If all acts should be held to be void, which apply only to one, or to a limited number of individuals, many of the most important rights claimed by a portion of our citizens, would prove unfounded. Incorporations could only

have uniform privileges, if they could at all exist under special enactment. The legislature would have no power to grant special privileges or exemptions to individuals, and would be compelled to prescribe uniform rules for every individual in the State.

These enactments then, leave the rights of the parties, in this case, as regulated by the principles of the common law. Its principles, according to the maxim " *Sic utere tuo ut alienam non loedas*," or " enjoy your own in such a manner as not to injure another person," apply to this case. When the public highway became established, every person became possessed of the right to travel over it at all times, when interest, convenience or pleasure might dictate. This right is not superior to, but is only co-extensive with the rights of others. No person, or portion of community have the legal right to appropriate it, or any portion of it, to their exclusive use. Nor can one person have a superior right to its enjoyment, over another person. But from necessity, when passing over it, no two persons can occupy the same portion of it, at the same time.

When appellants procured their charter, acquired the right of way, and constructed their road, they became invested with the exclusive right to use and enjoy it, except such portions as passed over the public highway, and to that portion in the course of their business, they acquired the right to use it in the same manner, to the same extent and under the same liabilities, as the balance of community. They had the same but no better right, to cross a public highway with their trains at the point of intersection with their road, that individuals have to cross their road at the same place. This right is mutual, co-extensive, and in all respects reciprocal. And in the exercise of these rights, all parties must be held to a due regard for the safety of others. In the exercise of these rights, they must be mutually held to every reasonable effort, to avoid inflicting or causing injury or loss to others. It will be presumed that the servants of a railway company are cognizant of the various road crossings on the line of their road, and that persons are liable at all times to be in the act of passing the point of intersection, and they should be on the look-out, so as to avoid injury to others, who may be passing the road, as well as those in their charge, so far as may be done by the use of all reasonable effort. Their locomotives and trains being heavy and less under their control than that of vehicles employed on common highways, they cannot be held to have them as completely in their power to prevent injury, as persons may have theirs who travel on highways. But this should not excuse efforts to foresee and prevent collisions, at the crossings of public highways. When danger is seen or

Galena and Chicago Union Railroad Co. *v.* Dill.

might be seen by the exercise of ordinary prudence, they should be held to all reasonable effort to avoid it. The safety of those of whom they have the charge, as well as those traveling on the highway, requires it. On the other hand, persons using the highway must be held to the use of all reasonable efforts on their part, in like manner to foresee and avoid danger. A want of proper circumspection on their part is liable to produce disastrous consequences to railroad travelers, as well as to themselves. When the company have erected the proper signs and notices at the point of intersection, the highway traveler should under ordinary circumstances heed its warning, and use the proper precaution to avoid a collision, and failing to do so, negligence more gross on the part of the company only will render them liable for injuries received.

The question of negligence is one of fact, which must be left to the determination of the jury. It depends to so great an extent upon the surrounding circumstances of each case, that unless it is gross, no rule can be adopted. The jury must necessarily determine from the situation of the parties, and all of the surrounding circumstances, whether there has been negligence on either part, or whether the occurrence was purely accidental, and without the fault of either party. The court has no authority to determine the fact of negligence, unless it be in the non-observance of a positive requirement of law. Whether the failure to ring a bell or sound the whistle is negligence, is a question of fact for the jury, and could not be so regarded, unless its omission occasioned the collision, producing the injury. Where such acts are not required by legislative enactment, their omission does not raise a legal inference that the injury resulted from a want of their performance.

By this instruction the jury are told that if the appellants, by reason of any negligence in not ringing the bell, or sounding the whistle of the locomotive, within a reasonable distance from the crossing of the highway, and the plaintiff was free from fault, that they should find for the appellee. This instruction assumes that it was a legal duty imposed upon the appellants to ring the bell, or sound the whistle, and that its omission rendered them liable. The law has made no such provision. This could not be negligence unless its omission produced the injury complained of, and the law not having imposed the liability, the court could not give to its omission such an effect. It may be, that the result would have been the same, if the bell had been rung, or the whistle sounded, and if so, it was not negligence to omit it. The instruction should have left it to the jury to say, whether the omission to ring the bell or sound the

whistle was negligence, which produced the injury, and failing to do so, it was error to give it.

There is no other error perceived in the record, either in the admission or rejection of evidence, or the giving or refusing the various instructions asked.

The judgment is reversed and the cause remanded.

*Judgment reversed.*