THE OHIO AND MISSISSIPPI RAILROAD COMPANY, Appellant,
*v.* SAMUEL McCLELLAND, Appellee.

THE SAME, Appellant, *v.* SAMUEL SHANAFELT, Appellee.

### APPEALS FROM JEFFERSON.

The act approved 14th February, 1855, requiring all railroads then completed and open for use, to be fenced, and imposing as a penalty for non-compliance, the payment of all damages which may result to cattle thereby, although such requirement was not expressed in their charters, does not conflict with the 17th section of the 13th article of the constitution.

Acts of incorporation are subordinate to general police regulations.

IN March, 1859, plaintiff below filed his declaration in the Circuit Court of Marion county, claiming damages for stock killed by the trains of the railroad company. The declaration was framed upon the statute of 1855, respecting the fencing of the right of way by railroad corporations.

Defendant below filed three pleas, the general issue, and two special pleas, *actio non*, denying any liability under the statute, on the ground that it was no part of the charter of the corporation, not having been asked for, or assented to, by the railroad company, and that by the the terms of its charter, granted in 1851, it was not bound, under the statute of 1855, to fence the road, nor in any way liable for the value of the cattle killed without any fault on the part of the corporation, or its agents or servants.

Plaintiff below demurred to the second and third pleas. The issues being made up, the cause, on motion of the defendant below, was changed in its venue, and taken to Jefferson county, and came on for a hearing at the May term, 1860. The demurrer to the second and third pleas was sustained by the court. The cause was tried before a jury, and a verdict returned for plaintiff in the sum of $100. Motions for a new trial, and in arrest of judgment, were made and overruled, and exceptions taken. Judgment was entered upon the verdict rendered by the jury.

Defendant excepted to the judgment and finding, and prayed an appeal to the Supreme Court.

By consent these cases were heard in the Second Grand Division.

The issues were the same in both cases.

WILLIAM HOMES, and ISHAM N. HAYNIE, for Appellants.

S. L. BRYAN, for Appellees.

WALKER, J.   The appellants became an incorporated company, under an act of the legistature, adopted in 1851. . They organized, constructed their road, and have ever since continued to operate it, under that act of incorporation.   On the 14th day of February, 1855, after the completion of their road, the legislature adopted the act requiring all roads in the State then completed and open for use, within six months after its passage, to erect and maintain sufficient fences, on the sides of their roads, to prevent live stock from getting upon their tracks.   The act imposes as a penalty for a non-compliance with its requirements, that the corporation, thus neglecting, s'iall be liable to pay for all damages which may be done to such stock on their road, by their agents, or engines.   Appellants insist, that inasmuch as these requirements were not embodied in their charter, and have not been assented to by them, that they are not bound to conform to the provisions of this act, as it is in violation of their chartered privileges.

They urge that this act contravenes the 17th section of the 13th article of our constitution, which provides that, " No *ex post facto* law, nor any law impairing the obligation of contracts, shall ever be made," etc.   The decisions of the British and American courts are numerous, and believed to be uniform, that a charter of a private corporation, not created for public or municipal purposes, is a contract between the government and the corporators.   When such a charter is granted and accepted, it creates an implied agreement that they shall be permitted to exercise the rights and franchises conferred, and that they will, on their part, in good faith accomplish the objects of their creation, and discharge all the duties imposed by their charter.   Being a contract, it necessarily follows, that any act of the legislature which repeals, materially impairs, or alters their rights, without their assent, would be in contravention of this constitutional provision.

This then presents the question whether this act, not assented to by the company, deprives them of any material vested right, secured by their charter.   The charter is in the usual form of such acts, and if exemption from a compliance with the requirements of this enactment is possessed, it is not by any express provision of the charter, but is by implication, or legal intendment.   It is a rule of interpretation, that grants made by the government are to be liberally construed in favor of the public. In other words, when such a grant is made, whilst the grantee takes the thing granted, with all the reasonable and proper means of its enjoyment, yet nothing else passes by implication. When a charter of this description is granted, the corporators take as an incident, the right to employ all reasonable, necessary

and proper means for the accomplishment of the end of their organization, unless limited by the charter, or reasonably controlled in its exercise by the legislature. And in these, as well as in the express grants and exemptions, they acquire a vested right, subordinate only to the general welfare of society.

In this age of improvement, and rapid advance in material development of the wealth of the country, when incorporated bodies are created in such numbers, for the advancement of this end, and when legislative bodies grant corporate privileges with such freedom, for almost every conceivable purpose, and when they are created for purposes which, but a few years past, private enterprise or ordinary copartnerships were supposed to be fully adequate, it becomes a question of no small moment to ascertain and clearly define their general privileges, and the extent to which they may be controlled by legislative action. It never could have been the legislative will, that these bodies, when created, should be wholly independent of and irresponsible to the government. If such was the operation of their charters, then we have created in the heart of our government, an uncontrollable power, which must, sooner or later, become dangerous to our rights, if not to constitutional liberty itself. But if, on the other hand, they, like individuals, are under the reasonable control of the government, they may accomplish the purposes of their organization, and prove a blessing to civilization, and not destructive to government.

In the formation of government, the great object sought, is to afford protection to the citizen or subject, in the enjoyment of his rights, and thereby promote general happiness. To accomplish this most important of all purposes, adequate power must be delegated to the constituted authorities, to employ the most appropriate means, not prohibited, for the attainment of the end sought. And to maintain the order and well-being of society, it becomes the duty of government to exercise that power, and not only to exercise, but to preserve it. In exercising this power it becomes a duty to maintain and preserve the person of each individual member of society, from aggression or injury from others ; and to maintain and preserve the general and special rights of each individual, and also each member of the community, in relation to his property. These duties devolving upon government are paramount, and in the absence of authority conferred by the fundamental law, it may well be doubted whether the legislature can alienate them to another body, or organization. The power thus conferred upon government is in the nature of a trust, created by the governed, and should only be exercised by the officers, and in the mode prescribed by the organic law.

The end and object of government, then, being to promote

the happiness and prosperity, and to secure and protect the community in the peaceful enjoyment of their rights, and safety of their persons, it can never be intended, in the absence of express language, that government designed to part with the power of accomplishing these great objects of its creation. It cannot be intended, in the absence of the clearest expressed intention, that it was the design of the legislature to surrender this power to a body of individuals, in no manner connected with the government, and the moving consideration of the members of which, at its creation, was only to advance their pecuniary interest. Government would cease to be of any great value, if it were to disarm itself, by grant or otherwise, so as to be unable to exercise the power, and perform the duty, of protecting its citizens, in the rights, to secure which government was organized. If these powers were irrevocably yielded by the government, to irresponsible corporations, that result must inevitably ensue.

In granting this charter, the legislature has not, in terms, surrendered the right to subject it to general police regulations. If such a result has ensued, it is alone by implication. But we have seen that in the absence of express language, such an exemption cannot be inferred. When these bodies are created, although they are artificial persons, intangible, and only existing in legal contemplation, they are held to be subordinate to, and under the control of the government to the same extent as individuals. They have at all times been required to conform to the general laws of the State, precisely as if they were real and not artificial persons. To hold otherwise, would be to say that the legislature might create an *imperium in imperio*. "A government existing within another government."

The principle governing this case has undergone much discussion and judicial consideration in other tribunals. In the case of the *Providence Bank* v. *Billings et al.*, 4 Pet. R. 514, the Supreme Court of the United States held, that notwithstanding the State, in granting the charter to the company, had failed to expressly reserve the right to tax its property, yet the power had not been surrendered, and might be rightfully exercised. That a tax afterwards imposed, and not provided for in the charter, was not a violation of their chartered rights. In that case it was, as it is in this, contended that if the legislature could impose such a burthen, it might impose such onerous assessments as must render their franchises of little or no value. But Chief Justice Marshall, in delivering the opinion of the court, says, in reference to the taxing power, "But as the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to

be presumed, in a case in which the deliberate purpose of the State to abandon it does not appear." So of the power of regulating the general police of the State. And the case now before us must be held to be precisely the same in principle, and must receive the same answer.

The power to enact police regulations, operates upon all alike. This is a fundamental principle, and lies at the foundation of society itself. It is yielded by each member when he enters society, for the benefit of all. It is incident to, and a part of government itself, and need not be expressly reserved, when it grants rights or property, to individuals or corporate bodies, as they take subservient to this right. Although individual rights may be said to be absolute, they are all subject to be controlled in their enjoyment for the general good. It is in the just exercise of this power that individuals have been required to fence their lands, or forfeit the right to recover damages for trespasses committed by stock, of other persons. So of quarantine regulations, to protect communities against the introduction, and spread of contagious diseases. And in prohibiting the exercise of noxious and unhealthy trades and manufactures, and in requiring the fencing of saltpetre caves, and growing castor beans. In prohibiting the sale of unwholesome provisions, and stock from running at large affected with contagious or infectious distempers. From the sale of obscene books and prints, cards and gaming implements. The law has imposed all of these and many other duties and prohibitions upon individuals, for the protection of citizens, their morals and property; and notwithstanding it may appear in some degree to abridge individuals, of a portion of their rights, yet we are not aware that their constitutionality has ever been challenged. Their eminent justice and propriety has commended them to the community at large as highly proper. The exercise of this power may be referred to the maxim, *Salus populi suprema est lex.* "That regard be had to the public welfare, is the highest law."

That corporate franchises in private corporations are vested rights, requiring the protection of government, cannot be denied. They are special individual rights, which fall as clearly within the requirement, as that of any other class. But like the general rights of individuals, they are subject to be controlled for the general welfare. That the right, and not only the right, but the duty of protecting the traveling public from danger, while intrusted to the care of these bodies and their agents, is devolved upon government, is unquestionably true. And for that purpose the legislature may, beyond all doubt, regulate the speed of their trains, require them to place guards at bridges and other points of danger, and they may as they

have done, require the sound of a whistle or a bell at road crossings and thoroughfares for the safety of passengers and others, together with their property.  *Galena & Chicago U. R. R. Co.* v. *Loomis*, 13 Ill. 548 ; *Galena & Chicago R. R.* v. *Dill*, 22 Ill. 264.  In the latter of these cases it was said, that when the safety of persons or property may demand it, these bodies may be required to exercise their franchises in such a manner as to afford the necessary protection.  Then when the safety of persons and property both, demand the fencing of these roads, it is no more than the exercise of a reasonable police regulation to require it, and to impose adequate penalties to secure a compliance.  And the imposition of such a duty does not deprive the company of any of their corporate rights or franchises, as they still exist, and may be exercised, although it may be in a less commodious manner ; but when the public exigencies demand it, they must submit to the regulation, as if required of individuals.

When such bodies accept their charters, it is upon the implied condition, that they are to exercise their rights, subject to the power of the State to regulate their actions, as it may individuals.   We are aware of no single instance, in which the legislature has, in granting such charters, prescribed the mode in which they shall execute or perform their agreements, or shall become liable as common carriers, or for damages resulting from negligence or otherwise.   Yet they have at all times been required to conform to the general laws on these and other subjects.   When brought into being, in contemplation of law, such a body becomes, for most purposes, a person and a subject of the State.

It therefore follows, that this enactment was not prohibited by the constitution, and is binding upon this company.   Nor do we perceive any error in these records, and the judgment of the court below in each of these cases must be affirmed.

*Judgments affirmed.*


BREESE, J.   I do not concur in the reasoning, or judgment of the court, in these cases.