## The Northwestern Fertilizing Company

### v.

## The Village of Hyde Park.

1. CONSTRUCTION—*of legislative grants.* All grants by the legislature must, in cases of doubt, be construed most favorably to the government.

2. When an enactment will bear two constructions, one injurious to the public and the other not, the courts must adopt that which will not work injury.

3. There is always an implication connected with grants to corporations, that, in performing their functions and exercising their powers, they shall only employ lawful and honest means.

4. When a grant of power is conferred on such bodies, and the means of its exercise are not specified, they may employ the most natural and appropriate legal means to accomplish the end; but they are not thereby authorized to employ any means they choose, without regard to the rights of others, the interests of individuals, or the welfare of communities. The means adopted must be suitable to the end, and in conformity with the maxim, *sic utere tuo ut alienum non lædas.*

5. POLICE POWER OF THE STATE—*who subject thereto.* All persons possess their rights, whether to things tangible or intangible, subject to the general police power of the State; and corporate bodies are not, nor can they be, a privileged class in this regard.

6. The exemption of an individual or a class of individuals from punishment for crimes and misdemeanors, by an act of the General Assembly, would not prevent that body from the repeal of such law, and bringing them under the general law punishing crimes and misdemeanors; and the same rule applies to a body corporate.

7. The charter of the village of Hyde Park authorized the town authorities to determine what were nuisances, and to abate the same, with a proviso that nothing therein contained should authorize the town or its officers to prohibit, interfere with, hinder or obstruct parties engaged in carrying offal from the city of Chicago to a designated point in the town, and from manufacturing the same into an agricultural fertilizer, etc. In 1869 this charter was revised, and the same powers as in the original conferred, with the proviso that such powers should not be exercised against the Northwestern Fertilizing Company until the lapse of two years after the passage of the act: *Held,* that such inhibition from exercising the police power against such company did not inure to such company as a grant; that it was only a police regulation operating upon and

controlling the village government, and that the company could claim no privilege under it after the expiration of the two years.

8.  The enactment by implication fully authorized the village to enact appropriate ordinances to abate nuisances, and to enforce the same after the expiration of the two years.

APPEAL from the Circuit Court of Cook county; the Hon. W. W. FARWELL, Judge, presiding.

Mr. LEONARD SWETT, and Mr. JOHN I. HERRICK, for the appellants.

Messrs. HITCHCOCK & DUPEE, for the appellees.

Mr. JUSTICE WALKER delivered the opinion of the Court:

In the year 1867, a number of persons became incorporated, under an act of the General Assembly, as the Northwestern Fertilizing Company. They were, by their charter, empowered to establish depots in the city of Chicago for the reception of offal, dead animals and animal matter, either from the city or from individuals, and to erect a factory for its conversion into an agricultural fertilizer, to be established at a designated point about fifteen miles south of the city. The charter authorized a subscription of $250,000 of stock in the company, and the organization was to continue for fifty years.

After their organization they commenced the manufacture of the fertilizer, and continued to operate their factory until this suit was brought. In conducting this business, the company received substantially all the offal in the city, with the refuse from the packing houses, and all dead animals, during the winter, which they worked up and converted into a fertilizer during the next summer and autumn.

On the fifth day of March, 1867, three days before this charter was granted to appellants, the General Assembly adopted an act revising the charter, and its various amendments, of the town of Hyde Park. By it the village was expressly authorized to regulate and control groceries, or occupants of cellars, tallow chandlers' shops, soap factories,

tanneries, or other unwholesome, nauseous houses or places, and to compel the owners or occupants to cleanse, or remove or abate the same ; to determine what are nuisances, which are or may be injurious to the public health, and to abate the same in any manner they may deem expedient ; to regulate, restrain, prohibit or license breweries, tanneries, packing houses, butcher shops, stock yards, or establishments for the steaming or rendering of lard, tallow, offal, or such other substances as can or may be rendered, boiled and steamed, and all establishments or places where any nauseous, offensive, unwholesome or immoral business may be conducted. But the 31st section of the charter provides, that nothing therein contained should authorize the town or its officers to prohibit, interfere with, hinder or obstruct parties engaged in carrying such offal from the city of Chicago to a designated point in the town, and from manufacturing the same into an agricultural fertilizer, or other chemical product. The charter of the town was again revised in March, 1869, when substantially the same powers were conferred upon the trustees, but the 16th section contained this proviso : "That the sanitary and police powers conferred by this act shall not be exercised by said board of trustees, as against the Northwestern Fertilizing Company or the Union Rendering Company, located at or near the Calumet river, in said town, until the full expiration of two years from and after the passage of this act."

Subsequently, this, among other ordinances, was adopted by the village : "No person shall transport, haul or convey any offal, dead animals, or other unwholesome matter or material into or through the village of Hyde Park ; and any person who shall be in charge of or employed on any train or team carrying or conveying any such matter or matters into or through the village of Hyde Park, shall be subject to a fine of not less than five nor more than fifty dollars for each offense."

After the adoption of this ordinance, and after the expiration of two years, from March, 1869, appellants continued to

transport offal, dead animals and animal matter through the town of Hyde Park to their factory, to be converted into the fertilizer; and after giving notice to appellants that the ordinance would be enforced, on the 8th day of January, 1873, the town authorities arrested the engineer and other employees of the Fort Wayne and Chicago Railway, who were engaged in carrying offal through the village to the factory of appellants, on a charge of violating the ordinance. They were tried, convicted, and fined $50 each. This being highly injurious to the business of appellants, they filed this bill to enjoin any further prosecutions under the ordinance. A hearing was had on the bill, answer, replication and proofs, when the court below denied the relief sought, and dismissed the bill. From that decree the company appeal to this court.

Appellants claim that, under their charter, they have granted to them the privilege of pursuing their business, although it may be a nuisance to the citizens in the neighborhood; that the only limitation on the power, and it is implied, is, that they shall use the best known chemical and mechanical processes to prevent its becoming an annoyance to others, and shall, in the future, adopt and use such further improvements as may be discovered during the continuance of their charter; that they have, in this respect, discharged their entire duty; that the State, by granting the charter to the company, thereby entered into a contract with the corporators and their successors that they might use the franchise and manufacture the fertilizer during its continuance; that by accepting the charter and organizing the company, they acquired vested rights in the franchises and privileges thus granted, freed from the police power of the State, and that the General Assembly does not possess the power to render the corporation, its members, employees or servants, liable to the law for creating a nuisance, nor to confer such a power on the village of Hyde Park. These we understand to be the grounds assumed by appellants as to the law of the case.

An examination of the evidence in this case clearly shows that this factory was an unendurable nuisance to the inhabitants, for many miles around its location ; that the stench was intolerable, producing nausea, discomfort, if not sickness, to the people ; that it depreciated the value of property, and was a source of immense annoyance. It is, perhaps, as great a nuisance as could be found or even created—not affecting as many persons as if located in or nearer to the city, but as intense in its noisome effects as could be produced. And the transportation of this putrid animal matter through the streets of the village, as we infer from the evidence, was offensive, in a high degree, both to sight and smell.

The legislative branch of a government is vested with the power to give shape to, and control its policy, by the enactment of laws. It has the power to say what shall or shall not be done by its citizens ; to declare what shall constitute legal and what illegal acts or pursuits; to define what acts shall constitute crimes, what misdemeanors, and what shall be innocent and lawful ; and, in the exercise of these powers, that branch is under no control, unless it be restrained by the fundamental law creating the government. No other department, in our form of government, can check or obstruct the legislative department in the exercise of this power. It is true, the people, by the election of persons to the General Assembly, who entertain different views, may modify or repeal such laws. But, until thus modified or repealed, the laws constitutionally passed must be regarded as of full and binding force. In our system of government, the legislative department are intrusted with the sole power of enacting laws for the government of the people, and these laws must be enforced, unless repugnant to the constitution of government by which that department is created, and under which it acts. No law can be repealed but by the authority which enacted it.

Laws, however, when enacted, must be interpreted and applied to the various human acts which they were intended to control, and, in such interpretation, the courts to whom

that duty is intrusted, act upon well recognized canons of construction, among which is that one which declares that all grants by the legislature must, in cases of doubt, be construed most favorably to the government. Another is, that, where an enactment will bear two different interpretations, one injurious to the public, and the other not, the courts must adopt that which will not work injury, and it is because it must be presumed that the legislature, which was created to enact just and reasonable laws to protect the governed in their rights, and for the promotion of their happiness, did not intend to violate their duty and to inflict injury. And, under the first, as the General Assembly is intrusted with the power of legislation, it can not be presumed, in making a grant, that they intend to divest themselves of power intrusted to them for the protection and welfare of the governed, and hence it can not be inferred that they intended, in a grant, to yield any more than is shown by clear and express language. And especially is this so, where the grant, in its nature, is irrevocable.

It was not intended, when the government was framed, that the legislative department should ever yield or irrevocably cede the power of governing the people in the best manner, to individuals, or to a collection of individuals. Whilst the experience of the past has shown that good government may be promoted and the people better secured in their rights by the creation of municipal corporations, it has, so far as our researches have led us, never been held that the powers granted to such bodies may not be withdrawn and resumed at the will of the legislature; and to hold that the powers thus granted became, in such bodies, vested rights, would be contrary to the intention of the people in forming the government. They intrusted the legislature with its vast powers, to be exercised by them for the general good, and not to be granted beyond the power of recall to either municipal bodies or to individuals. The legislative department holds this power in trust, to be used by them and them alone, whenever

the public good requires it.    If they could irrevocably deprive that branch of government of the power to protect the people against crime, misdemeanors, and frauds and oppressions, the very object and purpose of the creation of the legislative department would be defeated.    It never was intended or supposed that the legislature would ever deprive themselves or their department of government of their constitutional power to enact wholesome laws for the protection of the citizen from wrong and oppression.    And it being contrary to their duty, there can be no presumption that they so intended, unless the language employed in the grant is so plain that it will bear no other construction.

The power conferred by the charter is this: "Said corporation is hereby authorized and empowered to establish and maintain chemical and other works at the place designated herein, for the purpose of manufacturing and converting dead animals and other animal matter into an agricultural fertilizer, and into other chemical products, by means of chemical, mechanical and other processes."    Does this grant of power authorize this company to violate the criminal laws of the State, by creating a nuisance for which an individual might be indicted and punished?    In terms, it certainly can not be so held.    It contains no language which purports to grant such an immunity.

All will readily admit that, when private corporations are created, unless exempted by legislative enactment, they are amenable to the criminal laws and the police regulations of the State, precisely as are natural persons.    It would be monstrous to hold that, because an artificial person is created and authorized to perform certain acts, and to accomplish certain ends, in doing so, the body may resort to criminal agencies.    There is always an implication connected with the grant of such charters, that, in performing their functions and exercising their powers, they shall only employ lawful and honest means.    It is true, that when a grant of power is conferred on such bodies, and the means of its exercise are not speci-

fied, they may employ the most natural and appropriate legal means to accomplish the end. They are not, however, thereby authorized to employ any means they may choose, without regard to the rights of others, the interests of individuals or the welfare of communities. The means adopted must be suitable to the end, and in conformity with the maxim, *sic utere tuo ut alienum non lœdas.* Such bodies can only exercise such powers as are expressly granted, or as are necessary to accomplish the purpose of their creation.

Was, then, this power given by implication? Did the General Assembly intend to give this body the power, in manufacturing the agricultural fertilizer, to create a nuisance, injurious to the health and comfort of the citizens, and highly injurious to the enjoyment of their property, and destructive to its value? As government is organized and maintained for the protection of the people in their lives, persons and property, and the legislature is intrusted with the enactment of laws to effectuate these objects, the presumption is, that they are controlled by the maxim *salus populi est suprema lex,* and not for the promotion of the interest of the few, to the injury of the many. A reasonable construction of this grant of power is, that this company may carry on their business for the purposes indicated, upon the condition that they should do so without violating any public law, and without creating a public nuisance. This seems to us to be the only reasonable interpretation that can be given to the language employed. This same charter authorizes this company to establish depots in the city, to receive the dead animals and animal matter to be manufactured. But there is no specific provision that the company shall so manage these receptacles as that they shall not become a nuisance, and yet no one would contend that they have a contract with the State by which they can permit such matter to lie there indefinitely, and become putrid, and a nuisance to the people in the vicinity. And in what consists the difference? In the one, they may receive the matter; at the other, they may manufacture

41—70TH ILL.

it.  But we see no greater exemption in the one case than in the other.  The maxim applies, *legis constructio non facit injuriam.*  Hence, in construing statutes, the presumption must be adhered to, that it was not intended to injure any one, much less the people generally.  When such an intention is expressed in clear and explicit language that admits of no construction, then courts can but carry out the legislative will, when that body has not transcended the limits of their power.

In the case of *The Ohio and Mississippi Railroad Company* v. *McClelland,* 25 Ill. 140, it was held, that, in granting the charter to the railroad company, the legislature not having, in terms, surrendered the right to subject it to the general police regulations, in the absence of express language, such an exemption would not be inferred; that, in the creation of these bodies, they must be held to be subordinate to and under the control of the government, to the same extent as individuals; that they had, at all times, been required to conform to the general laws of the State, precisely as if they were natural, and not artificial persons.  To hold otherwise would be to create a government within a government, independent and free from its control.  And the case of *Providence Bank* v. *Billings,* 4 Pet. R. 514, was referred to, where Chief Justice MARSHALL says, in reference to the State not having relinquished the power to tax the bank, "but, as the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of the State to abandon it does not appear."  So of the power to regulate the general police of the State.  The power to impose police regulations operates upon all alike, and this is a fundamental principle, lying at the very foundation of organized society.  It is yielded by each member when he enters society, for the good of the entire community; that it is incident to and a part of government itself, and need not be expressly reserved when it grants rights or property to

individuals or to corporate bodies, as they take subject to this right.   See *Galena and Chicago Union Railroad Company* v. *Appleby*, 28 Ill. 283, and *Dingman* v. *The People*, 51 Ill. 278, where the same rule is announced.

Had a citizen erected this structure and created this nuisance, does any one suppose that such person would not have been liable to prosecution and punishment?   An individual, in the pursuit of gain, had the undoubted right to make such an erection, and use it, too, provided it did not become a nuisance, and inflict injury upon others.   And why, or how, does an artificial person, created to promote private interest and, incidentally, promote the general welfare, acquire any greater or more sacred rights than the individual citizen? Does any one suppose that the General Assembly could, by enactment, authorize, irrevocably, an individual, for his private gain, to inflict injury to the life, health, peace and property of the community?   And if the irrevocable power to do these things by an individual can not be granted, how can it be contended that such irrevocable power can be conferred on a corporation?   Such entities should be content to have the powers of natural persons, and be subject to the same rules prescribed for the government of the community in which they exist.   We hazard nothing in saying that the General Assembly never supposed they were creating artificial bodies not subject to be controlled by the police power, inherent in and inseparable from the sovereignty of the State. It would be impossible to suppose the General Assembly, or, in fact, any government, would or could divest itself of all power beyond recall, to prescribe what are crimes, and to punish them.   And if such a grant may be made to corporations, it may be to individuals.   If with one person, it may be with all in community, and the power of protection be lost, and the ends of government defeated.

Nor is it an answer to say that it is conceded by agreement or contract.   The legislature has the same power to say to an individual, if he will perform a particular act, or pursue a

specified calling, he shall be released from the police power of the State, as to say to a number of persons that, if they will organize and perform that act, or pursue that occupation, they shall be free from its operation.

The General Assembly might omit the performance of the duty resting upon them, by failing to prescribe what shall constitute crimes, and in not providing for their punishment. If so, then, so long as a civil remedy should not be taken away, each individual would be left to his action against the wrong-doer for the injury inflicted upon him; but the exemption of an individual, or a class of individuals, from punishment for crimes or misdemeanors, by an act of the General Assembly, would not prevent that body from the repeal of that law, and bringing them under the general law punishing crimes and misdemeanors; and why should they exempt a body corporate? No reason is perceived why they should not, in this respect, be governed as are natural persons. The formation of government was to confer equal rights and protection to all persons.

In view of what we have said, we must, therefore, hold that all persons possess their rights, whether to things tangible or intangible, subject to the general police power of the State, and that corporate bodies are not, nor can they be, held to be a privileged class in this regard. When created, they are endowed by the provisions of their charters, to the extent of the grant, with the same rights and are liable to the same duty and obedience to government as individuals. They are created persons, but not higher or superior to natural persons. They are endowed with rights and powers, within the scope of their franchises, to the same, and only to the same, extent as natural persons. To hold otherwise is to reverse the rules of construction, the theory and policy of government, to change the principles on which it is based, to encroach upon the rights of the people, and to create a power in the State beyond its control and highly dangerous to the general welfare. Such immunity to these bodies was not intended by

the framers of our government, and, we have no doubt, would have been expressly prohibited if they could have imagined that such privileges would be granted, or claimed by construction; nor can we believe the legislature supposed such exemption for such bodies would ever be claimed, or they would have expressly provided that they should be subject to the general laws of the State, precisely as are individuals.

Nor did the inhibition, in the village charter, from exercising the police power, in reference to this company, for two years, inure to this company as a grant to them. It was only a police regulation, operating upon and controling the village government. Appellants were not a party to that enactment, and have no right to claim any privilege under it after the expiration of the two years. It was not a grant of an immunity to the appellants, but it was a restriction on the village, preventing it from exercising the power for the specified period. This was the full scope of the enactment, and it, by implication, fully authorized the village to enact appropriate ordinances to abate the nuisance, and to enforce the same after the expiration of the two years named in their charter. The grant of power was ample, and its exercise was only suspended for the limited period, as to appellants and the other company, and when the time expired, all impediments to its exercise were removed.

Inasmuch, then, as the charter of appellants did not authorize them to create a nuisance, but only to exercise their franchise so as not to injure community, the authorities referred to are not applicable to the case. The cases referred to in reference to the erection of mills, may be regarded as necessarily producing the nuisances of which complaint was made, and as an implied authority by the legislature to maintain the nuisance; but even it were conceded that the General Assembly has such power, those cases are not like this, as no such power was granted by this charter; hence, those cases have no application.

Had the legislative power been thus exerted in the cases

646    N. W. FERTILIZING CO. *v.* HYDE PARK.    [Sept. T.

Opinion of the Court.

referred to, and had the courts held that the owners of the mills were nevertheless exempt, then the cases would have been analogous, and would have demanded of us the determination whether we would have yielded obedience to them as authority.

It also follows that the case of *Dartmouth College* v. *Woodward,* 4 Wheat. 518, and the other cases announcing the same rule, have no application. We have seen there was no contract between the State and appellants that they might create and maintain this nuisance, and hence no rights derived by contract have been impaired.

It is urged, that railroads in cities and towns are nuisances, but they are only exercising their franchises in thus operating them. If this be true, and we doubt not they may be so operated as to make them such, still the General Assembly has, in numerous instances, long after their charters were granted and the roads were constructed, enacted laws regulating the speed of trains in cities and towns, or conferred the power on such municipalities to do the same thing, and thus prevent the roads from becoming a nuisance; nor are we aware that this salutary exercise of the police power has ever been challenged. Its justness, and even necessity, have commended it to all, and it has not been questioned; and this is a fair illustration of the exercise of the police power over bodies corporate. It is on the same principle that railroads are required to fence their tracks, sound a whistle or ring a bell at highway crossings, and to come to a full stop before a train crosses another railroad. These and many other duties are imposed, as being necessary for the safety of the people and their property, and grow out of the implied power that the General Assembly may restrain these bodies, to promote the safety of community, as it may individuals.

After a careful examination of the record and an attentive consideration of the arguments filed in the case, we are unable to say that the court below erred in rendering the decree it did, and it must be affirmed.                    *Decree affirmed.*