THE STATE OF FLORIDA, APPELLANT, VS. THE BLACK RIVER PHOSPHATE COMPANY, APPELLEE.

1. The act of December 27th, 1856, entitled "An act to benefit commerce," and commonly known as "The Riparian Act of 1856," Sections 454 and 455 Revised Statutes, does not vest in riparian owners an unqualified fee in the lands below high water mark and out to the edge of the channel in navigable streams, bays of the sea, or harbors, of this State. So long as such submerged lands remained unimproved by the construction of wharves, or unreclaimed by filling in from the shore and converting the water into land, the riparian owner, though the legal title is in him, has in so far as the statute is concerned, no greater right to the beneficial use of such submerged lands and the waters above them than any other citizen except for the purpose of protecting from invasion the right to improve which the statute gives him. The statute does not give to the riparian owner the right to take phosphate from the beds of navigable streams, bays of the sea, or harbors, below high water mark and out to the edge of the channel, for the purposes of sale. The acts of June 7th, 1887, Chapter 3826, and June 9th, 1891, Chapter 4043, relating to the phosphate interests of the State in its navigable waters, permit the taking of such phosphates and prescribe the terms and conditions on which they may be taken, and these statutes apply to riparian owners falling within the provisions of the act of December 27th, 1856.

2. The act of June 9th, 1891, Chapter 4043, which gives to the Board of Phosphate Commissioners control of the phosphate interests of the State, and authorizes it to institute suits and legal proceedings in the name of the State to protect such interests, does not abate an action previously instituted by the Attorney-General in the name of the State.

3. A supplemental bill which presents a continuation of the same trespassing, does not introduce a new subject-matter of litigation.

Appeal from the Circuit Court for Clay county.

The facts of the case are stated in the opinion of the court.

## STATEMENT.

The act of June 7th, 1887, referred to in the opinions, grants to H. S. Greeno and others and such other persons as may associate with them, the right to dig and remove, for twenty five years, from the beds of the navigable waters within the jurisdiction of the State, the phosphate rocks and phosphatic deposits: Provided, That the persons named and other associates shall not in any way interfere with the free navigation of the navigable streams and waters of the State, or the private rights of any citizen or citizens residing upon or owning the lands upon the banks of such navigable rivers and waters. The grant is made on the express condition that the grantees shall pay $1 per ton for every ton of such phosphate dug and removed. It requires the execution of a bond of specified penalty and condition for making true returns of the quantity of phosphate mined and removed, and for making payment *annually* for the same; and also that their books shall be open for inspection by the Comptroller or his duly appointed agent, and provides that nothing in the act shall be so construed as to grant to the persons named exclusive rights. The statute also enacts: "That any other persons who may incorporate under the laws of the State of Florida shall have the same rights, privileges and franchises granted to said persons by this act, upon their complying with the requirements provided for in this act.

*The Attorney-General and A. W. Cockrell & Son* for Appellant.

*Cooper & Cooper* for Appellee.

RANEY, C. J.:

The appellee, the Black River Phosphate Company, a body corporate under our laws, has been taking phosphate from the bed of Black creek, or, as it is also called, Black river,. The company claims to be the owner of lands extending to the water of that stream, which is both tidal and navigable in fact, and founds its claim of title to, or right of property in, such phosphate, as against the State, upon such riparian ownership and the act of December 27th, 1856, entitled, "An act to benefit commerce," and commonly known as "The riparian act of 1856" (Sections 454, 455 Revised Statutes). The first section of this statute after reciting: "Whereas it is for the benefit of commerce, that wharves be built and warehouses erected for facilitating the landing and storage of goods; and whereas, the State being the proprietor of all submerged lands and water privileges, within its boundaries, which prevents the riparian owners from improving their water lots: therefore," enacts, "that the State of Florida for the considerations above mentioned, divest themselves of all right, title and interest to all lands covered by water lying in front of any tract of land, owned by a citizen of the United States or by the United States, for public purposes, lying upon any navigable stream, or bay of the sea, or harbor, as far as the edge of the channel, and hereby vest the full title to the same in and unto the riparian proprietors, giving them full right and privilege. to build wharves into streams or waters of the bay or harbor as far as

may be necessary to effect the purposes described, and to fill up, from the shore, bank or beach, as far as may be desired, not obstructing the channel, but leaving full space for the requirements of commerce; and upon the lands so filled in to erect warehouses, or other buildings, and also the right to prevent encroachments of any other person upon all such submerged land in the direction of their lines continued to the channel, by bill in chancery or at law, and to have and maintain action of trespass in any court of competent jurisdiction in the State for any interference with such property; also, confirming to the riparian proprietors all improvements which may have heretofore been made upon submerged lands for the purposes within mentioned." The second, or remaining, section enacts: "That nothing in this act contained shall be so construed, as to release the title of the State of Florida, or any of its grantees, to any of the swamp or overflowed lands, within the limits of the same; but the grant herein contained shall be limited to those persons and body corporate, owning lands actually bounded by, and extending to low water mark, on such navigable streams, bays and harbors."

The cases in which the act has come before this court for consideration are, Geiger *et al.* vs. Filor *et al.*, 8 Fla., 325; Alden *et ux.* vs. Pinney, 12 Fla., 348; Rivas and Koopman vs. Solary, 18 Fla., 122; Sullivan vs. Moreno, 19 Fla., 200; Ruge vs. Apalachicola O. C. & E. Co., 25 Fla., 656, 6 South. Rep., 480.

In Geiger vs. Filor, decided in 1859, the court having stated that by the laws of Spain, and England, the sovereign of neither country could have alienated the land covered by the water, then observes that the question is not raised "as to the power of the State to alienate, but whether the State has actually transfer-

red to complainants or to the proprietor from whom they derive title;" and afterwards remarking that the avowed object of the law is to give to the riparian an owners "the right and interest of the State in and to the land covered by water as far as the edge of the channel, and to owners who were prevented by the State's title from improving lots so situated between them and the water," it says that "if complainants are such owners in contemplation of law their case is made out; but it finds that they, as assignees of the reserved fee of the original proprietors or dedicators of the streets, are not riparian owners within the meaning of the statute. * * There are no water lots at the ends of the streets held by them and they are not the riparian proprietors prevented from improving any lots there claimed by them; * * neither the complainants, nor the original proprietor of the lots derived title to the land between high and low water mark at the end of the streets, from this law, and their claim on this ground is unsustainable." We also understand the view of the court to have been that as between the city and riparian owners of lots which also abut on a street, the city would be entitled to the benefits of the act as to land opposite the end of the street, as long as the street continued to exist as such, and such lot owners afterwards; and further, that the city was authorized by statute, apart from the riparian act, to·construct and maintain wharves at the foot of its streets.

In Alden *et ux.* vs. Pinney (decided in 1869), it was found that a street intervened between the land of complainants and high water mark, and consequently that the complainants were not riparian proprietors, and that any full discussion of the effect of the statute was improper. It is, however, observed in connection with

the subject of the equitable jurisdiction invoked, that
riparian proprietors, too, under the act of 1856, "have
a title coupled with a trust for the benefit of the pub-
lic;" and it is said in another connection that where-
ever the title to this soil—that from the street to the
channel—"is, whether in the city, or the heirs of Pin-
tado, or in the State, it cannot under existing laws be
used in any event to obstruct navigation or commerce.
If the grantees of the State hold it, it is coupled with
this trust, and if it is put to such use, or such use is
threatened, there are circumstances under which com-
plainants can properly seek a court of law or equity
to redress injuries. If this ice house, or any other
structure which defendants intend to construct, will
be an obstruction to navigation, a hindrance to com-
merce, or impede or transgress the rights of the public
in this respect, the remedy to correct this public evil
while it exists in the State courts, is not at the suit of
an individual citizen, except in case of special damage
to himself."

In Rivas and Koopman vs. Solary (A. D. 1881), the
opinion, after stating that "the question presented is,
who has the better right to the wharf and to the sub-
merged land beneath it," asserts that Williams (under
whom both parties claimed), as owner of lot 19, had
all the interest which followed from the act of 1856,
"which was all the right, title and interest of the State
to the land covered by the water lying in front of his
lot, subject to the trust that it was to be used for the
purposes of commerce, as stated in the statute;" that
this title was attended with no other restrictions than
those contained in the act, and that there was nothing
in the act prohibiting his transfer subject to the same
conditions that he held it on. That the effect of deeds
to plaintiffs could not be extended so as to make them

JUNE TERM, 1893. 87

State of Florida v. Black River Phosphate Co.—Opinion of Court.

convey land not embraced within the boundaries or descriptions given by them. That what was granted by the State through the riparian act was in terms something more than the ordinary right which the proprietor of lands on a navigable stream had to its use; and the right to use for commercial purposes, after the act, was an incident to the ownership of the land, which the State gave to the riparian proprietor. That anterior to the act Williams' title as riparian proprietor did not extend beyond high water, but afterwards it extended to the channel, the act, in its terms, vesting the full title in him who owns land actually bounded by and extending to "low water mark;" and that no ground could be seen by the court for holding "that it was simply appurtenant to the adjacent lands." That the State had the absolute proprietary interest in the land and could grant it to the riparian owner. It is further said that plaintiffs contend that the right to build a wharf passed as appurtenant to the land granted to them, but this could not be so for the reason that Williams' estate in the "land to the channel" was an estate in the land, and the right to build wharves was an incident to that proprietorship; and that plaintiffs' deed did not include this land, nor does land pass as appurtenant to land. The conclusion was that under the facts of the case Williams' deed to Miss Wightman and others who had conveyed to complainants did not carry the land subsequently conveyed by him to Solary, and that the order dismissing the bill was proper.

Sullivan vs. Moreno (A. D. 1882), is, like Alden vs. Pinney, a case in which the court found that Moreno, who was seeking to enjoin Sullivan from constructing a wharf in front of his holding, did not show title to land extending to high water mark. The opinion

88 SUPREME COURT.

states that prior to the riparian act, the State was the owner of the title to the soil of navigable tide waters to the line of ordinary high tide, "subject to the powers of Congress in the matter of regulating commerce under the Constitution of the United States;" and further, that by the statute, the State divested herself of the submerged lands specified therein, as far as to the edge of the channel, and, using the language of the statute, "vested the full title to the same in the riparian proprietors, giving them the full right and privilege to build wharves into streams or waters of the bay or harbor as far as may be necessary to effect the purposes described, and to fill up from the shore, bank or beach, as far as may be desired, not obstructing the channel, but leaving full space for the requirements of commerce, and upon the lands so filled in to erect warehouses or other buildings;" and giving the right to prevent encroachments as specified in the act. In the opinion it is also said that it was held in Alden *et ux.* vs. Pinney, that the evidence there failed to show that the complainants, or those whose title and right they claimed, had a water boundary in 1856, and that it was immaterial to inquire whether the rights granted by the State inured to anyone other than one "owning lands actually bounded by and extending to low water mark;" and also that if the plaintiff there "had shown himself a riparian proprietor, there would have been such existing and threatened injuries of a special nature, coupled with other circumstances, that he would have been entitled under the statute to the aid of a court of equity to prevent special injury to himself; and of Rivas and Koopman vs. Solary it is observed that there "each of the parties claimed through a common source of title, and it was admitted that the parties through whom they claimed held to low water

mark;" and also that "what constitutes riparian proprietorship is a water boundary either at high or low tide as may be the law;" and in considering the plaintiff's case as one founded on occupancy of a portion of the water front *independent of any riparian ownership*, but as a wood and coal yard, and a wharf which he had constructed in front of them out into the water, it is said: "The title to all this soil from the water line to the edge of the channel, with the right to fill it in, with stone or other material which he may see proper to use in the construction of structures beneficial to commerce, is in the riparian proprietor of 1856 or his grantee, whoever he may be. * * Under that act the title to the soil vested in the then riparian proprietor, coupled with the trust to use it for the benefit of commerce. Here the right to prevent the construction of this wharf is in the riparian proprietor."

There is nothing in Ruge vs. Apalachicola O. C. & F. Co. that calls for any notice, at least at this point, further than that in the opinion of Maxwell, C. J., after remarking that in view of previous conclusions it was scarcely necessary to consider the effect of the riparian act, it is observed that if the Promenado Garden, a park dedicated to the public for health, recreation and amusement, really went to the shore, there may be a question whether the act vests any right to the water front as a public park; and that the use of it, meaning the submerged land, for such a purpose, meaning that of a park, is not within the contemplation of the act, and either the State holds it, or, if it goes to the promenade, it goes divested of the character of a park, and if used at all must be used for the benefit of commerce in the erection of wharves, warehouses and other buildings.

It is entirely clear that in no one of these opinions is it undertaken to fully define the relative status of the riparian owners on the one hand, and of the public, or State, on the other, under the riparian act. The case of Rivas and Koopman vs. Solary is the only one whose facts rendered necessary any expression as to the effect or intent of that law, and it, in view of the fact that the court acted upon the admission of both parties that the original proprietorship of Williams extended to low water mark, can not be held to have been intended as finally committing the court to any further view of the statute than (1st) that it was a valid grant to the extent of vesting in a riparian owner, holding to low water mark, the legal title, without defining the trusts and uses upon and for which it was to be held and applied; and (2nd) that the land below high water mark does not necessarily pass to a grantee of the upland as an incident and appurtenance of the latter, but the submerged land, or any part thereof, may be reserved upon a sale of the upland, or be made the subject of separate sale, or be sold with the upland, the question of the intent of the grantor that the submerged land, or any part thereof, shall or shall not pass with the upland being one of which the solution is to be found in the terms of the deed of conveyance. Codman vs. Winslow, 10 Mass., 146; Storer vs. Freeman, 6 Mass., 435; Mayhew vs. Norton, 17 Pick., 357; Niles vs. Patch, 13 Gray, 254; Valentine vs. Solomon, 22 Pick., 85; Green vs. Chelsea, 24 Pick., 71; Parker vs. Taylor, 7 Oregon, 435; Parker vs. Rogers, 8 *Ibid*, 183; Derrin vs. Long Wharf, 25 Maine, 51.

It is necessary to a proper solution of the question before us to ascertain the character of the title or holding of the State to the lands under navigable waters

at the time of the enactment of our riparian statute. Potter's Dwarris, 177, 178.

In Commonwealth vs. Alger, 7 Cush., 65, it is said that by the common law of England, as it stood long before the settlement of the colony of Massachusetts, the title to the land on property in the soil under the sea, and over which the tide waters ebbed and flowed, including flats on the sea shore lying between high and low water mark, was in the king as the representative of the sovereign power of the country. But it was held by a rule equally well settled that this right of property was held by the king in trust for public uses established by ancient custom or regulated by law, the principal of which were for fishing and navigation. These uses were held to be public, not only for the king's subjects, but for foreigners, being subjects of states at peace with England, and coming to the ports and harbors of England with their ships and vessels for the purposes of trade and commerce. Again, it is observed in the same opinion: In this holding by the crown, two distinct rights are regarded: 1. The *jus privatum*, or right of property in the soil which the king may grant and which may be held by a subject, and the grant of which will confer on the grantee such privileges and benefits as can be enjoyed therein subject to the *jus publicum*; 2. The *jus publicum*, the royal perogative, by which the king holds such shores and navigable rivers for the common use and benefit of all the subjects, and indeed of all persons of all nations at peace with England, who may have occasion to use them for the purposes of trade. This royal right, or *jus publicum* is held by the crown in trust for such common use and benefit, and can not be transferred to a subject or alienated, limited or restrained, by mere royal grant, without an act of parliament.

The king's grant, therefore, although it may vest the right of soil in a subject, will not justify the grantee in erecting such permanent structures thereon, as to disturb the common rights of navigation; and such obstruction, notwithstanding such grant, is held to be a public or private nuisance, as the case may be.

The specific nature of the trust in favor of all the subjects of the realm, upon which in England the sovereign held the domain of navigable waters and shores, and the soil thereunder, was that those subjects should have the free use of such waters and shores. The waters, though the domain over and right of property in them were in the crown, were of common right public for every subject to navigate upon and fish in without interruption; and though the right of property in the soil to high water mark was likewise in the king, yet the shore was also of common right public. The use of each was in the subjects for the inherent privileges of passage and navigation and fishing, as public rights, and since Magna Charter the king has had no power to *obstruct* navigation or grant an exclusive privilege of fishing; and the right of the people in this respect can not be restrained or counteracted by the sovereign as the *legal and sole proprietor.* Any grant of the soil by the king is always subservient in the hands of the grantee to the public rights mentioned, and is void in so far as it conflicts with these rights. Angell on Tide Waters, Chapter 1; Attorney-General vs. Parmeter, 10 Price, 378, 411; Attorney-General vs. Burridge, 10 Price, 360, 377; Duke of Somerset vs. Fogwell, 5 Barn. & Cress., 883, 884; Blundell vs. Catterall, 5 Barn. & Ald., 268; Martin vs. Waddell, 16 Peters, 367. In England the right of property in navigable waters, as stated above, being in the king, he could abate at his pleasure every purpresture or en-

croachment thereon that made several to the author of it that which ought to be common to all, whether such encroachment was a nuisance or not, nor could he license anything that was a nuisance to such common right. Whether or not a particular encroachment was a nuisance was always a question of fact, and not only merely of law. Though an erection below high water mark, or even below low water mark be a purpresture and abateable at the king's pleasure, it was not necessarily a nuisance. Angell on Tide Waters, 196-204; Weber vs. Harbor Commissioners, 18 Wall., 57; Alden vs. Pinney, *supra*.

But when the revolution took place, says the Supreme Court of the United States, in Martin vs. Waddell, 16 Peters, 410, the people of each State became themselves sovereign, and in that character held the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the rights since surrendered by the Constitution to the general government; and a grant made by their authority must therefore be tried and determined by different principles from those which apply to grants of the British crown when the title is held by a single individual in trust for the whole nation. Commonwealth vs. Alger, 7 Cush., 53, 90, 92, 93.

And subsequently, in Pollard's Lessee vs. Hagan, 3 How., 219, the Supreme Court decided that the shores of the navigable waters and the soils under them were not ceded by the original states through the Constitution to the United States, but were reserved by the states, subject however, to the power of the general government, under Section 8 of Article I of the Constitution, to "regulate commerce with foreign nations and among the several states;" and further, that new states admitted into the Union on equal

footing with the original states, have the same rights, sovereignty and jurisdiction over all such lands, within their borders. By the express provision of the act of Congress of March 3, 1845, Florida was "admitted into the Union on equal footing with the original states in all respects whatsoever." These lands must be regarded as having been withheld by the original states as essential to their sovereignty, and as having passed from the United States to the new states upon the same principle; and in Pollard's Lessee vs. Hagan, *supra*, it is also said that to give to the United States the right to transfer to a citizen the title to the shores and the soil under the navigable waters, would be placing in their hands a weapon which might * * deprive the states of the power to exercise a numerous and important class of police powers.

As tending to illustrate the nature of the tenure of these waters and the lands under them, including the shore, and the use for which the same are intended, it may be remarked that the right of property of the general government in other lands and waters, *i. e.* the uplands and non-navigable waters and the lands under the same—in the new states, and those in the original states granted by them to the United States, Pollard's Lessee vs. Hagan (3 How., p. 224), was not affected by the attainment of statehood. Section 2 of Article IV of the Constitution of the United States; Pollard's Lessee vs. Hagan, 3 How., p. 224. The reason of this distinction is, that this class of land and waters, when not held for forts, magazines, arsenals, dock-yards, or other needful buildings (Art. I, cl. 8, Section 17, Constitution), or for public parks or similar purposes, is not held for *use as such* by either the government or the people, but rather to the end that they shall finally become the subject of individual or several ownership

under such processes of disposition asC ongress may from time to time adopt, the proceeds, in case of sale, to be used for the common welfare according to the will of the law-making power. In the case however of navigable waters and the lands thereunder, including the shore, the chief end and purpose of their tenure is *the use of such waters, land and shore, themselves,* by each and all of the people as their common property.

In Galveston City Surf Bathing Co. vs. Heindenheimer, 63 Texas, 563, it is held that there the Gulf shore and surf belong to the public; that every citizen has the same rights there as every other citizen, and none have the right to the exclusive use of this public property; and that any citizen of the state has the the right to erect a bath house in the surf, so that it is not made a nuisance, or so constructed or used as to materially interfere with the rights of the public to the enjoyment of the waters and the shores of the Gulf.

In Weber vs. Harbor Commissioners, 18 Wall., 57, a case in which the the Harbor Commissioners of San Francisco, acting under a statute of California authorizing them to improve the harbor of that port, had caused piling, with capping and planking, to be put on both sides of a wharf which Weber had erected, and which extended into the navigable waters of the bay, such piling preventing any approach to the wharf by vessels, it is said, that by the common law the title to the shore of the sea and of the arms of the sea and in the soils under tide waters is, in this country, in the State; and that any erection thereon without license is therefore deemed an encroachment upon the property of the sovereign, or as it is termed in the language of the law, a purpresture which he may re-

move at pleasure, whether it tend to obstruct naviga-
tion or otherwise; and further, that although the title
to the soil under the tide waters of the bay was ac-
quired by the United States by cession from Mexico
equal with the title to the upland, they held it only in
trust for the future state, and that upon the admission
of California into the Union upon equal footing with
the original states, absolute property in and dominion
and sovereignty over all soils under the tide waters
within her limits passed to the state, with the conse-
quent right to dispose of the title to any part of said
soils in such manner as she might deem proper, sub-
ject only to the paramount right of navigation over the
waters so far as such navigation might be required by
the necessities of commerce with foreign nations or
among the several states, the regulation of which was
vested in the general government.

In McCready vs. Virginia, 94 U. S., 391, which af-
firmed the validity of a statute of Virginia prohibiting
citizens of other states from planting oysters in the
soil of that state covered by tide waters, the doctrine
of the opinion is that each state owns the beds of all
tide waters within its jurisdiction, unless the same
have been granted away; and that in like manner it
owns the tide waters themselves and the fish in them
so far as they are capable of ownership while running;
and that for the purpose of such ownership the state
represents the people in their united sovereignty, the
title thus held being subject to the paramount right of
navigation, the regulation of which in respect to for-
eign and interstate commerce has been granted to the
United States, there being, however, no such grant of
power over fisheries. "The fisheries," says the opin-
ion, "remain under the exclusive control of the state,
which has consquently the right, in its discretion, to

appropriate its tidal waters and their beds to be used by its people as a convenience for taking and cultivating fish so far as it may be done without obstructing navigation. Such an appropriation is in effect nothing more than a regulation of the use by the people of their common property. The right which the people of the state thus acquire comes not from their citizenship alone, but from their citizenship and property combined. It is in fact a property right, and not a mere privilege or immunity of citizenship.''

In Illinois Central Railroad Company vs. Illinois, 146 U. S., 387, it was held to be the well settled law of this country that the ownership of and dominion and sovereignty over lands covered by tide waters within the limits of the several states belong to the several states within which they are found, with the consequent right to use or dispose of any portion thereof when that can be done without substantial impairment of the interest of the public in the waters, and subject always to the paramount right of Congress to control their navigation so far as may be necessary for the regulation of commerce with foreign nations and among the states. And in this opinion it is said: That, by the common law, the doctrine of the dominion over and ownership by the crown of lands within the realm of England under tide waters 'was not founded upon the existence of the tide over the lands, but on the fact that the waters were navigable, tide waters and navigable waters being used as synonymous terms in England. That the public being interested in the use of such waters, the possession by private individuals of lands under them could not be permitted except by license of the crown, which could alone exercise such dominion over the waters as would

insure freedom in their use so far as consistent with the public interest; this doctrine being founded upon the necessity of preserving to the public the use of navigable waters from private interruption, a reason as applicable to navigable fresh waters as to those moved by the tide. * * That the state holds the title to the lands under the navigable waters of Lake Michigan, within its limits, in the same manner that the state holds title to soil under tide water, by the common law, * * * and that title necessarily carries with it control over the waters above them, whenever the lands are subjected to use. But it is a little different in character from that which the state holds in lands intended for sale. It is different from the title which the United States hold in the public lands which are open to preemption and sale. It is a title held in trust for the people of the state that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from obstruction or interference of private parties. The interest of the people in the navigation of the waters and in commerce over them may be improved in many instances by the erection of wharves, docks and piers therein, for which purpose the state may grant parcels of the submerged lands; and so long as their disposition is made for such purpose no valid objections can be made to the grants. It is grants of parcels of lands under navigable waters that may afford foundations for wharves, piers and other structures in aid of commerce, and grants of parcels which, being occupied, do not substantially impair the public interest in the lands and waters remaining, that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public upon which such lands are

held by the state.    But that is a very different doc-
trine from the one which would sanction the abdica-
tion of the general control of the state over
lands under the navigable waters of an en-
tire harbor or bay, or of a sea or lake.    Such abdi-
cation is not consistent with the exercise of that
trust which requires the government of the state to
preserve such waters for the use of the public.    The
trust devolving upon the state for the use of the pub-
lic, and which can only be discharged by the manage-
ment and control of property in which the public has
an interest cannot be relinquished by a trasfer of the
property.    The control of the state for the purpose of
the trust can never be lost, except as to such parcels as
are used in promoting the interests of the public there-
in, or can be disposed of without any substantial im-
pairment of the public interest in the land and waters
remaining.    It is only by observing the distinction be-
tween a grant of such parcels for the improvement of
the public interest, or which, when occupied, do not
substantially impair the public interests 'in the lands
and waters remaining, and a grant of the whole prop-
erty in which the public is interested, that the lan-
guage of the adjudged cases can be reconciled. General
language sometimes found in the opinion of the courts,
expressive of absolute ownership and control by the
state of lands under navigable waters, irrespective of
any trust as to their use and disposition, must be read
and construed with reference to the special facts of the
particular case.    A grant of all the lands under the
navigable waters of a state has never been adjudged
to be within the legislative power; and any attempted
grant of the kind would be held, if not absolutely void
on its face, as subject to revocation.    The state can no
more abdicate its trust over property in which the

whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instances of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police power in the administration of government and the preservation of the peace. In the administration of government the use of such powers may for a limited period be delegated to a municipality or other body, but there always remains in the state the right to revoke those powers and exercise them in a more direct manner, and one more conformable to its wishes. So with trusts connected with public property or property of a special character, like lands under navigable waters, they cannot be placed entirely beyond the direction and control of the state.     *     *     The ownership of the navigable waters of the harbor (that of Chicago), and of the lands under them, is a subject of public concern to the whole people of the state. The decisions are numerous which declare that such property is held by the state by virtue of its sovereignty in trust for the public. The trust with which they are held, therefore, is governmental and cannot be alienated except in those instances mentioned of parcels used in the improvement of the interests thus held, or when parcels can be disposed of without detriment to the public interest in the lands and waters remaining. This follows necessarily from the public character of the property being held by the whole people for purposes in which the whole people are interested.     *     *     Necessarily must the control of the waters of a state over all lands under them, pass when the lands are conveyed in fee to private parties and

are by them subjected to use. * * The soil under navigable waters being held by the people of the state in trust for the common use and as a portion of their inherent sovereignty, any act of legislation concerning their use affects the public welfare. It is therefore appropriately within the exercise of the police power of the state. * * The legislature could not give away nor sell the discretion of its successors in respect to matters, the government of which, from the very nature of things, must vary with varying circumstances. The legislation which may be needed one day for the harbor, may be different from the legislation that may be required at another day. Every legislature must, at the time of its existence, exercise the power of the state in the execution of the trust devolved upon it."

Though the language of these decisions from the Supreme Court of the United States is broader or less restrained in the two former cases than in the last, yet, as intimated in the last, there is no conflict of view in them, where the general expressions of the former are construed with reference to their respective facts—a point beyond which the general observations of an opinion can not properly be carried or relied on. Of the facts of the second of them, McCready vs. Virginia, it is unnecessary to say more than is stated above. In Weber vs. Harbor Commissioners, the legislature of California, by an act of March 26th, 1851, granted to the city of San Francisco, for ninety-nine years, the use and occupation of portions of the lands lying in front of the city and within a certain designated line, and declared that this line should be and remain a permanent water front of the city. It also provided that the city authorities should keep the space beyond the line, to the distance of five hundred yards, free

and clear from all obstructions whatever, and reserved to the state the right to regulate the construction of wharves and other improvements so that they should not interfere with the shipping and commercial interests of the bay and harbor. Another statute, enacted about a month later, authorized the city to construct wharves at the end of all the streets commencing with the bay, the wharves to be made by extending the streets into the bay not more than two hundred yards beyond the above mentioned water front line, and provided that the space between the wharves, when extended, should remain free from obstructions, and used as public slips for the accommodation and benefit of the general commerce of the city and state. In 1853 the predecessors of Weber acquired the title of the city to certain lots, about one hundred and twenty feet in extent, lying along the stated water front, and in 1854 they built a platform along this front, the whole length of the lots, and then constructed from the centre thereof into the bay a wharf 84 feet long and fifty feet wide, leaving a space on each side for the approach and dockage of vessels. The permanent water front as established, was in many places, including the one in question, at a great distance from the line of the shore of the bay, as that shore existed when the state was admitted into the Union. Ships of the largest size then floated at the lowest tide along this line. From the construction of the wharf until the interference of the Harbor Commisioners, who were acting under a statute of 1863, the owners and their successors continued in the uninterrupted possession of the same and collected tolls and wharfage. The decision of the court was that Weber took whatever interest he obtained subordinate to the control by the city over the space immediately beyond the line of the

water front, and the right of the state to regulate the construction of wharves and other improvements, and that he was not a riparian proprietor having a right to wharf out into the bay; and that the erection of the wharf was an interference with the rightful control of the city over the space occupied by it, and an encroachment upon the soil of the state which she could remove at pleasure; and that having the power of removal, the state could, without regard to the existence of the wharf, authorize improvements in the harbor, by the construction of which the use of the wharf would necessarily be destroyed. The legislation of 1863, whose purpose was the protection of the harbor, and the convenience of shipping and promotion of commerce, was clearly within the provisions of that of 1851 as to keeping the space beyond the line clear and free from obstruction, and that that between the wharves at the end of streets should remain for use as slips, and also within the designated reservation in favor of the state; subject to which earlier legislation the predecessors of Weber took whatever interest they obtained.

The facts in the case of the Illinois Central R. R. Co. vs. Illinois were, in short, and so far as they need be stated, that the railroad company constructed its roadway two hundred feet in width along the water front of the city of Chicago, on Lake Michigan, with tracks thereon and with guards against danger in its approach and crossings and a breakwater on the east beyond the tracks, and necessary works for the protection of the shore on the west, such works being constructed pursuant to the requirements of an ordinance of the city, under authority of law, as a condition of the city's consent to the location by the company of its road within the corporate limits. As to these works,

including the roadway, extending as they did out into the water, it was held that they did not as a matter of fact interfere with any useful freedom in the use of the waters of Lake Michigan for commerce, either foreign, interstate or domestic; and, being authorized by law, they could not be held to be such an encroachment upon the domain of the state as to require the interposition of the court for their removal, or for any restraint in their use. And it was also decided that the company did not by its reclamation from the waters of the lake of the land upon which its track were laid, or the construction of the road and works connected therewith, acquire an absolute fee in the tract reclaimed with a consequent right to dispose of the same to other parties, or to use it for other than railroad purposes; nor did it, by constructing such roads and works acquire a right as a riparian owner to reclaim additional lands from the water for its use or for the construction of piers, docks and wharves in furtherance of its business, the extent to which the company could reclaim being limited by the conditions of the ordinance both as to the width to which reclamation could be made and the works to be constructed. The company also acquired the fee in certain lots on the lake front, and reclaimed land and built piers and slips in front of the same, and it was held that it had the right to use in its business such reclaimed land and slips, unless it should be found on further examination upon remanding the cause, that the piers as constructed extended beyond the point of "practicable navigability" in the waters of the lake; but it was also decided that the construction of a pier or the extension of any land into navigable waters, by one not the owner of the riparian land does not give such power; whether an individual or a corporation, any riparian

rights. Some years subsequently (A. D. 1869) the legislature passed an act granting to the company all the right and title of the state in and to the submerged land constituting the bed of the lake and lying east of the tracks and breakwater of the company for the distance of one mile, the fee of such land to be held in perpetuity by the company without power to grant, sell or convey the same; and it was decided that this act not only could not be invoked to extend the riparian rights of the company resulting from its *ownership* of the lots referred to, but also that as to the remaining submerged lands covered by the terms of the act, it was not competent for the legislature to thus deprive the state, or people, of the ownership of the submerged lands in the harbor of Chicago, and of the consequent control of its waters, and that the cession was inoperative to affect, modify or in any respect control the sovereignty and dominion of the state over the lands or the ownership thereof, and that the act of 1869 was annulled by a repealing act of 1873.

It is entirely clear that there is nothing in the Virginia and California cases that either called for or justified a precise definition of the nature of the tenure or trusts upon which lands below low water mark are held, or of the powers of the legislature, as the representative of the people, to dispose of them. The general assertions made in them were entirely sufficient for the purposes of the cases under adjudication, and are not authority beyond the issues made therein. The power of the legislature of California to grant to San Francisco, as against the people of California, or even any one else, the submerged land out to the permanent water front, was not questioned in the California case, nor do the state or people of Virginia question the validity of that state's oyster legislation

in the McCready case. The issues in the Illinois case are, however, altogether different, and required the full adjudication and exposition there made, and we have found nowhere any authority that is in conflict with the conclusions presented by it. Attorney–General vs. Parmeter, 10 Price, 378. We are sure that the case of Hoboken vs. Pennsylvania Railroad Co., 124 U. S., 656, presents no such conflict, and do not feel that it is necessary to say more of it.

Excluding, as immaterial to the question before us, all rights growing out of interstate and foreign commerce under the Constitution of the United States, the result of these authorities is, that at the time of the passage of our riparian act the navigable waters of the State and the soil beneath them, including the shore or space between high and low water marks, were the property of the State, or of the people of the State in their united or sovereign capacity, and were held not for the purposes of sale or conversion into other values, or reduction into several or individual ownership, but for the use and enjoyment of the same by all the people of the State for, at least, the purposes of navigation and fishing, and other implied purposes; and the law-making branch of the government of the State considered as the fiduciary or representative of the people, were, when dealing with such lands and waters, limited in their powers by the real nature and purposes of the tenure of the same, and must be held to have acted with a due regard for the preservation of such lands and waters to the uses for which they were held.

In construing this act not only are we to keep in view the real nature of the subject-matter, but it is to be judged in the light of the rule applicable to all grants by the government, which is that they are to

be strictly construed, or be taken most beneficially in favor of the state or public, and against the grantee. Potter's Dwarris, 174; Gouldon Waters, Sections 23, 36; Brittain vs. Cromford Canal Co., 3 Barn. & Ald., 139; Stourbridge Canal vs. Wheeley, 2 Barn. & Adolph., 792; Feather vs. Queen, 6 Best & Smith, 257; McManus vs. Carmichael, 3 Iowa, 1; Commissioners vs. Holyoke Water Power Co., 104 Mass., 446; Minturn vs. Larue, 1 McAllister, 370; Northwestern Fertilizing Co., vs. Hyde Park, 70 Ill., 634. It will not be presumed that anything was intended to pass that is not denoted by clear and special words. Martin vs. Waddell, 16 Peters, 411. "As a rule," says the Supreme Court of Massachusetts, in Commonwealth vs. City of Roxbury, 9 Gray, 451, 492, 493, a case similar in its nature to this, "in all grants from the government to the subject, the terms of the grant are to be taken most strongly against the grantee, and in favor of the grantor. * * But this rule applies *a fortiori* to a case where such grant by a government to individual proprietors is claimed to be not merely a conveyance title to land, but also a portion of the public domain which the government held in a fiduciary relation for general and public use. * * But where a body like the colonial government holds two distinct powers, one for granting and distributing lands to parties entitled, for settlement in perpetuity, and of which power it is in the habitual and constant exercise as one of the ordinary and prominent purposes of its establishment; and, at the same time, has a fiduciary interest and authority over the public domain; the grant while it conveys the land will not be held to include any portion of such public right, unless it is included in its terms, by express words or necessary implication." See also Stevens vs. P. & N. R. Co., 34 N. J. Law, 532, 553.

The intent and effect of this grant are to be ascertained from a consideration of all its parts. We have before us no simple transfer to the riparian owners of the title of the public or people in their sovereign capacity to the soil from high water mark to the edge of the channel. The effect of such a grant, considering the fiduciary nature of the holding, would be nothing more than a transfer of the title subject to the public trusts. And whether or not such a transfer would create any beneficial right in the contents of the soil beneath the sea, in so far as such contents could be used or availed of without impairing the public use of such waters and of the rights incident thereto, is immaterial to decide; and for the reason that in our judgment the same conclusion as to the meaning and effect of the act, as it is, follows whichever of these hypotheses we assume. If such simple grant would be to carry the property right contended for by the appellee, the additional terms of the act must have been intended to limit what would have been the effect of such a grant; whereas if an unqualified grant would not have given it, the added language is insufficient to do so. Ignoring both the title and the preamble, considered merely as such, there is still apparent in its body, or enacting part, the distinct public purpose of connecting the shore and banks of bays, harbors and streams with the channel of navigable waters. Instead of being an absolute and unqualified gift to individual proprietors of land intervening the shore or banks and the channel, it is, so long as the water shall not be converted into land by filling in, a grant for a particular end and specially defined use, and one in which the terms used, considered with reference to the subject-matter, show that the public trust upon which the property was held

was not lost sight of, but its preservation and promotion intended. This purpose, in so far as is shown by the enacting part of the statute (outside of the words: "for the consideration above mentioned," which mean: to the end indicated by the preamble) is to be found in the words: "giving them the full right and privilege to build wharves into streams or waters of the bay or harbor as far as may be necessary to effect the purposes described, and to fill up from the shore, bank or beach as far as may be desired, not obstructing the channel, but leaving full space for the requirements of commerce, and upon lands so filled in to erect warehouses or other buildings;" the words "purposes described," used in this connection, referring to that of facilitating the landing and storage of goods as stated in the preamble, by the means indicated in the act; and they in effect incorporate the preamble into the body of the statute and make it a part thereof. Nowhere in the statute can anything be found that is inconsistent with the intent indicated, the language of the title and that of the preamble and the remainder or body of the statute are in fullest accord with it; and there is no inconsistency between the title, and preamble and the remainder of the act. The people of the State being the proprietors of all the navigable streams, bays and harbors, and of the land beneath them, Attorney-General vs. Chambers, 4 De G. M. & G., 205; Stevens vs. P. & N. J. R. R. Co., 34 N. J. Law, 533, and the Legislature, their representative, deeming it to be for the public good and the promotion of commerce that, wherever wharves were required to bring together the shore and the channel or the former and the vessels navigating such waters, wharves should be built and warehouses erected for facilitating the landing and storage of

goods which might be the subject of conveyance on
any of such navigable waters, and recognizing that
such ownership of the State and its consequent powers
were a bar to the riparian owner building such wharves,
or improving their riparia lots in any of the ways per-
mitted by the statute, and the public, or State, not be-
ing prepared to undertake the work of building such
wharves or filling in the water, it determined to en-
courage the riparian owner to do what the State alone
could do of itself, or authorize another to do without
possibility of any interference that would cause a loss
to such riparian proprietor.  The plan of the act is
that [the title of the *submerged land* should be vested
in the riparian owner *for these uses and purposes*.
The State, ''for the considerations above mentioned,''
divests herself, and invests the riparian owner with
the title to the land.   These ''considerations'' are for
the purpose and end that commerce may be benefited in
the manner described by the statute; and that the
grant is, one of the class in which the purpose that the
submerged *land*, which is the subject of the grant,
shall, as long as it is of that character, be used or ap-
plied for the benefit of commerce, is apparent and con-
trolling.   Admitting that it vested the full title in him,
as it would seem it did, still the sole uses and the pur-
poses of exclusive benefit to himself for which it was
vested, are those declared in the act and necessarily
implied in the same.   As the holder of such title he
was to have the right and privilege to build wharves
into the stream or waters of the bay or harbor as far
as may be necessary to effect the purpose of landing
and storing goods which at any time are to become
or be the commerce of such stream or other waters,
not obstructing the channel, but leaving full space for
the requirements of commerce.   He also has the right

State of Florida v. Black River Phosphate Co.—Opinion of Court.

to fill up the water from the shore, bank or beach, as far as he may desire, not obstructing the channel, being thus allowed to extend the shore from the original high water mark towards the edge of the channel by supplanting the water by earth, converting *pro tanto* the natural water-way into earth, and with the further right and privilege, in the latter case, of erecting warehouses or other buildings "*upon lands so filled in.*" Though the act secures to the riparian owner the right of such beneficial improvement of the submerged land, and consequent improvement of his riparian lot; and though the improvements contemplated by the act, when made, can be used for all proper purposes by the owner in the same way that similar properties, however obtained, may be used, yet it never was the purpose of the act that any beneficial use of the submerged land or bed of the waters distinct from that appertaining to any other member of the public should vest in the riparian owner, or be enjoyed by him, except and until there has been an application of the submerged land to the designated purposes of the statute by making improvements of the character indicated. Until this is done, none of the exclusive privileges offfered by or flowing from the statute, as incident to such improvements, arise. The making of these improvements are contingencies upon which the Legislature intended that the exclusive rights necessary to the enjoyment of the same should arise. It never was its intention that the general rights of the public as to the use of the land or water should be impaired, or in any manner affected, so long as the riparian owner did not see fit to avail himself of the special privileges of the act; to hold that it was, would be to convert into an obstacle to commerce, and curtailment of the rights of the public, that which was intended as a promoter

of both in a specially prescribed manner, and would give without consideration special privileges which it was not intended should accrue except upon the performance of what are the purposes of the act, and must have been deemed an essential to their enjoyment. The statute vests him with the title, or annexes to the title to the riparian land the ownership, of the land granted by it out to the channel, but the beneficial use by him of this title and land are so limited by the other words and general purposes of the act that as against the public, the State, or any citizen of the State, he has, outside of the right to improve and thereby secure the consequential rights incident thereto, and the remedies for protecting such right to improve, no other or greater right or privilege than any other citizen of the State has. As long as he does not avail himself of this right he is the holder of the legal title, but without certain powers always incident to sovereignty in connection with such lands and waters, and subject to the power and duty of the State to restrain the use of such land to the purposes of the grant. New Orleans vs. U. S.; 10 Peters, 662, 737. Of course, he in the absence of subsequent constitutional or valid legislation, can protect his exclusive right to improve from invasion by "any other person," but except for the purposes of making such improvements, he, until he does make them, has no more right to land upon, to traverse, to fish for either floating, or swimming, or shell fish, or to dig in or use such lands below high water mark, or the waters above them, than any other citizen has. The terms of the statute, *other than those which merely vest the title* limit the use of the land, the subject of that title; just the same, and even more under the strict rules of construction obtaining in cases of public grants, as the

same clauses, in the usual form of an *habendum* may limit the ordinary granting words of a deed of convey-ance. 2 Blackstone's Comm., 298; 3 Washburn on Real Property, 437-440; Watters vs. Bredin, 70 Penn. St., 235; Nightingale vs. Hidden, 7 R. I., 115, 118. These words cannot be ignored. They were put there to limit and qualify the right of the riparian owner and preserve to the public every right not clearly ex-pressed by them or necessarily implied by their mean-ing, as given to such owner. The use of these lands, and the waters over them, in the digging and removing of phosphates or other substances on or beneath their surface, for gain, is not within either the expres-sion or the implication of these terms, or the purpose or intent of the statute. Before the act any citizen of the State had the right to go upon these waters, including the shore when the tide is down below high water mark, and to take fish from such waters and shore, and neither these, nor any other of the uses to which they were subject then, have been taken away by the statute so long as the riparian owner has omitted to make any of the improvements contemplated by the statute; but he could not go there and dig up the soil independent of the control and regulation of the State, and convert it to his own use or gain, nor can he do so now; nor has the statute given the riparian owner the right to do so. Gould on Wa-ters, sec. 24. Grant that his right to improve, and thereby secure benefits contemplated by the act as the result of such improvements, if he chooses to exercise it, may prevent the State from permitting anyone else to go there and take phosphates and defeat his right to so improve, and believing, as we do, that the exer-cise of the right, secured by the statute, to convert

water into land by *filling in*, results in the ownership
of such land as any other, or as land relieved of all the
trusts of its former submerged condition, still the act
grants to the riparian proprietor no such right as to
or in the land in its natural condition, and the State
has not parted with its power, as the representative of
the people, to prevent any use of the land which is not
authorized by the statute.   New Orleans vs. United
States, 10 Peters, 662, 737.   Conceding that the Legis-
lature may be limited, by the nature of the peoples'
tenure of such lands explained above, in its powers as to
the manner in which phosphates may be authorized to
be taken, even by a riparian owner, still in the absence
from the statute of any authority to take them from
the beds of navigable waters, he can not do so except
by the consent of the State duly given by the law-
making power, and upon such terms and conditions as
it may prescribe.

The decision in Hoboken vs. Pennsylvania R. Co.,
124 U. S., 656, is not in conflict with the above conclu-
sions; and what was expressly stated in the legislation
there as to benefits arising when the improvements
should be made, is with equal force implied here to the
extent stated above.

That such limited use of the lands was intended by
the Legislature, is also shown by the last clause of the
second section of the act, which clause reads: "also
confirming to the riparian proprietors all improve-
ments which may have heretofore been made upon
submerged lands, for the purposes within mentioned."
Construing it as meaning to confirm to such proprie-
tors only such improvements as had been made for the
special purpose of facilitating the landing and storage
of goods. or benefit of commerce, or as intending to
confirm for the advancement of the purposes of the act

all improvements of whatever nature, it is still clear that the use of the land and such improvements for such purposes of commerce was the end which the Legislature had in view. The intent to limit the use of the land in its natural state is further shown by the fact that no authority is given "to erect warehouses or other buildings" except on land which may be "filled in," the idea evidently being that until the water was made land, that only wharves, a known instrument of commerce, should be built on the submerged land; or, in other words, that so long as any land granted by the act remained submerged, that such land should only be used for purposes of commerce. Of course as soon as it became land by being filled in, there was no more reason why it should not be built upon than other land adjacent to the water; it is entirely relieved of the trust attached to lands submerged by navigable waters, just as if it had become land by accretion or sudden upheaval.

The only remaining provision of the act necessary to be discussed, under the facts of this case, is that giving to riparian proprietors the right to prevent encroachments of any other person upon all such submerged land in the direction of their lines continued to the channel, by bill in chancery or at law, and to have and maintain action of trespass in any court of competent jurisdiction in the State for any interference with such property. This provision is not, and was not intended as, a grant of any property right, and can not be invoked as such. It is simply remedial in its nature, and gives nothing which would not flow to the riparian owner by implication from other parts of the statute. We must look to the rights granted by the act to ascertain what can be

held to be "encroachments by another person upon all such submerged land," or "an interference with such property," as against the riparian owner. We have stated several things which would not be, and stated a class of things that might be. No such encroachments or interference are shown by this record.

Whether we should hold the word channel to mean merely the point of practical navigation, or give it an interpretation more favorable to the riparian owner, we are satisfied that the grant, construed as it is above, is valid, but we can not admit that a disposition of the land under the entire water front of our actually navigable streams, bays and harbors on terms less favorable to the public would be so.

In interpreting this statute, we do not think we have given any effect to the preamble that the purview of the act does not itself sustain (Potter's Dwarris, 267, 269); or have ignored or treated as surplusage any of the words of the statute, nor given too much force to any of them and thereby given the law a meaning different from the intent shown by it as a whole; and the intent and purpose which we have ascribed to the law makers is founded upon the meaning of the words of the act considered as a whole and with reference to its subject-matter. So considered, the act in our judgment, does not import a broader meaning or different intent than we have given it. Potter's Dwarris, 175, 194 and notes.

The decisions on the Massachusetts Colonial Ordinance are worthy of consideration in this connection. The ordinance as adopted in the year 1641 was: "Every inhabitant that is an house holder shall have free fishing and fowling in any great ponds and bayes, coves and rivers, so farre as the sea ebbes and flowes within the precincts of the towne where they dwell,

unless the free men of the same towne or the General Court have otherwise appropriated them; provided that this shall not be extended to give leave to any man to come upon others' propertie without there leave." In 1647 it was amended thus: "The which clearly to determine; it is declared that in all creeks, coves and other places about and upon salt water, where the sea ebbs and flows, the proprietor of the land adjoining shall have propertie to the low water mark, where the sea doth not ebbe above a hundred rods and not more wheresoever it ebbes further; provided, that such proprietor shall not by this libertie have power to stop or hinder the passage of boats or vessels, in or through any sea, creeks or coves, to other men's houses or lands." *Vide* note to Commonwealth vs. City of Roxbury, 9 Gray, 465; Commonwealth vs. Alger, 7 Cush., 67. In Commonwealth vs. Charlestown, 1 Pick., 180, an indictment for a nuisance in not repairing bridges which the court of sessions had established over a navigable stream, the opinion (pp. 183, 184), having observed that the government to encourage the building of wharves, quays and piers, and to prevent disputes and litigation, transferred its property in the shore of all creeks, coves and other places upon the salt water, where the sea ebbs and flows, says: "Those who thus acquired the property of the shore were restricted from such a use of it as would impair the public right of passing over the water, in boats or other vessels, through any sea, creeks or coves, to other mens' houses or lands, by which it was intended to reserve a free passage over the water in such places, in the same manner as it existed before the public property in the shore was transferred. The ordinance of 1641 has therefore made no alterations in the use of places therein described

while they are covered with water, and they remain free for all the citizens of the commonwealth; so that even the proprietor of the flats cannot lawfully erect anything upon them which will obstruct or hinder such passage, though he may build wharves extending towards the sea to the distance of one hundred rods, provided he do not thereby straiten or interrupt the passage over the water in such manner as to constitute a public nuisance." The case of Commonwealth vs. Alger, 7 Cush., 53, cited *supra*, is one where the defendant was in 1849, and had been for more than thirty years, a riparian owner fronting on the harbor of Boston. In 1837 a statute relating to encroachments upon such harbor was passed, the first and second sections of which established a line designated by local objects. The third section enacted that no wharf, pier, building or encumbrance of any kind shall ever be extended beyond such line into or over the tide water in the harbor; and, the fourth, that no person shall enlarge or extend any such structure, which is now erected on the inner side of said line, further towards such line than such structure now stands, or than the same might have been lawfully enlarged or extended before the passage of this act, without leave first obtained from the legislature; and the fifth section, that no person shall in any other part of the harbor belonging to the commonwealth, erect or cause to be erected any wharf or pier, or begin to erect any wharf or pier therein, or place any stone, wood or other materials in said harbor, or dig down or remove any of the land covered with water at low tide, with intent to erect any wharf or pier therein, or to enlarge or extend any wharf or pier now erected; provided however, that nothing herein contained shall be construed to restrain or control the

lawful rights of the owners of any lands or flats in said harbor. The sixth section made any violation of the act a misdemeanor, punishable by fine, and provided for the removal of any such offending structure as a nuisance. Acts of 1840, 1841 and 1847 provided for changes of the line, the acts of 1840 and 1847 containing similar provisions to those of secs. 3, 4, 5 and 6 of the act of 1837, except that they omitted the proviso to the fifth section. Alger was indicted under the act of 1847. In 1843 he began to build a wharf on his flats, and constructed the northerly wall thereof from his upland nearly to the channel and then filled in and constructed the wharf, but did not complete it until the line had been established pursuant to the act of 1847; after which he built a triangular pier, complained of in the indictment, which pier forms part of the wharf as originally commenced by him. This pier was beyond the line of 1847, but on defendant's flats, and not one hundred rods from the upland, nor below low water mark, was no injury to navigation, and was not so far beyond the commissioners' line, or so near the channel as the northerly wall of the wharf was built in 1843. There was verdict of guilty, and the Supreme Court of Massachusetts in affirming the same passed upon the nature and effect of the colonial ordinance, and the question of the invalidity of the statute of 1847 as impairing the rights vested by such ordinance in riparian proprietors. As to the ordinance it was held that it vested in the riparian owner the fee of the flats as land, and not as an incorporeal hereditament; and the further views on this point are best explained by the following extracts from the opinion: "Again, the construction which has been put upon this act in all the judicial decisions which have been made upon it,

\*   \*   has been that notwithstanding the act vests a fee in the soil in the riparian proprietor, analogous to the *jus privatum* or right of property, which at the common law the crown could grant to a subject, yet that the land between high water and low water, until it was inclosed, built upon, or so occupied by the riparian proprietor, so for partook of its original character, that whilst covered by the tide water the public and all persons might lawfully use it, might sail over it, anchor upon it, fish upon it, and by so doing no person should be held to commit a trespass, or disseize the owner, or take adverse possession. The public used only a common right, by so using these lands when covered with tide water. \* \* \* Looking at the terms of this law, and the purposes for which it was intended, the object seems to have been to secure to riparian proprietors in general, without special grant, a property in the land, with full power to erect such wharves, embankments and warehouses thereon, as would be usually required for purposes of commerce, subordinate only to a reasonable use of the same by other individual riparian proprietors and the public, for the purposes of navigation, through any sea, creeks or coves, with their boats and vessels." As to the act of 1847, the decision was that the legislature had power to establish lines in the harbor beyond which no wharf should be extended or maintained, and to declare any wharf extended or maintained beyond such lines, a public nuisance; and that statutes doing this take away the right of proprietors of flats in the harbor beyond the lines to build wharves therein, even when they would be no actual injury to navigation. That such statutes were not unconstitutional on account of making no provision for compensation to the owner, nor as impairing the obligation of the grant

made by the colonial ordinance; but that such stat-
utes could not affect wharves erected before their pas-
sage. In Commonwealth vs. Tewksbury, 11 Met., 54,
it was held that a statute, which imposed a penalty on
any person who should take, carry away or remove any
stones, gravel or sand from any of the beaches in the
town of Chelsea, was passed for the purpose of pro-
tecting the harbor of Boston, and extended as well to
the owners of the soil as to strangers, and that the stat-
ute did not constitute such a taking of private prop-
erty and appropriating it to private use, within the
meaning of the usual constitutional provision as to
render the statute void, although no compensation to
the owner was provided for in it. Another case illus-
trating the effect of this colonial ordinance is that of
Weston *et al.* vs. Sampson *et al.*, 8 Cush., 347, decided
in the same year, yet subsequently to Commonwealth
vs. Alger, *supra*. It was an action of trespass *quare
clausum*, by the plaintiffs against defendants, who
went in their boat upon plaintiffs' flats, between high
and low water mark, and within one hundred rods of
the shore, and there at low water dug clams and car-
ried them away in their boat. It was held that the com-
mon law right of fishing extended to shell fish, as well
those embedded in the soil as those which lie on the
surface. That this right of fishing extended to the
people of Massachusetts, and has not been taken away
by the colonial ordinance. That though under it the
riparian owner has an interest in the soil, it is not an
absolute and unqualified ownership; but so long as flats
so situated are left open, unoccupied by a wharf, dock
or other enclosure, so long as the tide ebbs and flows
over them, they so far retain their original character
and remain public. * * That the rule established
by usage and judicial decision has been that although

the ordinance transfers the fee to the riparian owner, yet until it is so used, built upon or occupied by the owner as to exclude boats and vessels, the right of the public to use it is not taken away, but that whilst open to the natural ebb and flow of the tide, the public may use it, may sail over it, anchor upon it, fish upon it, and by so doing commit no trespass and do not dis- seize the owner." Drake vs. Curtis, 1 Cush., 413. In Lakeman vs. Burnham, 7 Gray, 437, the action was in tort for breaking and entering the plaintiff's close and taking clams, and there was verdict for de- fendant, who plead the right of free fishing in all the citizens of the commonwealth. The decision sustained the verdict. A part of the testimony in this case was that for sixty-two years plaintiff, or his father before him, had claimed the exclusive right to dig clams on that part of the beach, including the premises, and had been in the habit every year of selling rights to other persons to do so, and had always driven away persons who came to dig without their leave, and had often prosecuted and recovered ·judgment against them before a justice of the peace; and that for more than twenty years plaintiff had taken pains to culti- vate clams on these flats by transplanting and propa- gating them; and that before the publication in 1854 of the decision in Weston vs. Sampson, no one ever claimed a right to dig clams on these flats, and that since that time plaintiff had gone with a number of men and dug a ditch around the flats where he had planted clams and put down stakes, but they were pulled up by persons who came to dig. Proctor vs. Wells, 103 Mass., 216. In Packard vs. Ryder, 144 Mass., 440, the decision was that a person may, from a boat, enter upon and walk along the unenclosed flats of another, between high and low water mark,

and within one hundred yards of the upland for the purpose of fishing in the sea, and may so fish while on such flats.

Limited as is the right of the riparian proprietor under the Massachussetts ordinance, construed as it has been in the light of the common law as to the right of the public in navigable waters and the lands thereunder, still we think there is a manifest distinction between that grant and our riparian act. There it was the manifest purpose to grant all that property in the shore that could be granted not inconsistent with the right of passage, navigation and fishing referred to. The saving of the public rights there are to be found in the declaration as to free fishing and the proviso as to the passage of boats and vessels, and the common law principles above referred to. Here the right of the public is not founded on a mere declaration, an exception or proviso, or saving clause, or application of the designated principles of law to a *general* grant, but in the fact that the beneficial right granted to the riparian owner is special and limited, and carefully defined, manifesting the legislative intent that all that is not clearly carried by it should remain in the public; and to this residuum of the public interest, the legal title held by the riparian proprietor is as much subject as it would be if it remained in the State, charged with the same beneficial interest in his favor which has been given to him by the statute. Granting that our riparian owners may maintain trespass against those who dig and carry away a part of the soil, as it was held in Porter vs. Shehan, 7 Gray, 475, that the Massachusetts owner could where there was a taking of "muscle-bed," it must be upon the theory that such a trespass damages or impairs the right to make improvements contemplated by the statute. Ex-

cept for  the purpose of  such  improvement, he  has neither under  the  statute  nor  independent of  it, no more or other right of action  for,  or  in  restraint of, such a taking than any other citizen has.

The statute  of  June  7th,  1887, Chapter  3826,  pp. 280-1, pamphlet  laws  of  that year, was full notice to the appellees of the policy of  the State with reference to the phosphate deposits in her navigable waters; and that no one was to be permitted to  take  them  except upon the terms therein prescribed. The provision of the first section of  this statute,  to the effect that  the  persons named in it should  not in any way *interfere* with the free navigation of  the  navigable  streams and waters of  the State, or the private rights of  any  citizen residing upon or  owning the lands upon  the banks of said navigable rivers  and waters of the State,  can not be invoked  as recognizing the right of a riparian owner to take the phosphates in such  waters.   He  had no such right, nor does this  act, taken as a whole, recognize any  such  right as existing in him.   The  subsequent legislation on this subject, in 1891, Chapter 4043 Revised Statutes, pp. 981-983, pp. 74-77 acts of  1891, as held by us in State *ex rel.* vs. Board  of  Phosphate Commissioners, 31  Fla.,  558,  12  South.  Rep.,  913, clearly asserts the right of  the State  to these deposits as against the riparian owner; yet  there is no  ground for saying that our opinion  there  pretends to  decide anything as to the controversy between  the State and the riparian owner as to the ownership of  such  phosphates.   Parties  taking phosphates during  the operations of either of such acts should pay for them at the prices fixed therein.

The oyster legislation of  the  years 1881,  1885  and 1887, to be found in Sections 468 to 473, 2447, 2771, Rev. Stat., is not antagonistic to  these  conclusions.   The

sole extent to which it recognizes an exclusive benefi-
cial ownership or right of use in submerged lands un-
der public waters in the riparian proprietor is "erect-
ing wharves, warehouses, or other permanent improve-
ments thereon;" and the natural construction to be
given this general language, which is to be found in
Section 471, is that it was intended as referring to
and meant to preserve the rights conferred by the ri-
parian act as therein defined. This section as it now
stands was passed in the year 1887 as an amendment
and substitute for a section of the act of 1881, which.
original section was to the effect that the act of 1881
should give no exclusive right or privilege to plant
oysters in front of land then owned by another person
and fronting on any of the waters of the State, with-
out the consent of the owner of such land, and that
the exclusive privilege conferred by the operation of
the act should not extend beyond the purchase or en-
try and occupation of the land in front of which any
such oyster bed may have been located. Outside of the
use of the words "bays and harbors" in the amenda-
tory section, there is practically no difference in the
two sections. Each was intended to preserve riparian
rights under the act of 1856, and nothing more. The
later or amendatory section is more specific in its lan-
guage, but not more effectual. As against all other
rights, the right to plant in front of private riparian
lands is as exclusive against the owner as against any
one else, and as fully protected by the penal clauses
of the statute. It may also be remarked here that it
is clear from Section 470 that the location of stakes and
buoys to mark the beds, and the act of planting of
oysters itself, were regarded by the law making power
as not being a trespass upon the riparian owner's
rights, or an interference with them if they did not ac-

tually disturb his making improvements under the riparian act; and, in our judgment, so long as he forbears to thus improve, he has no ground for complaining, and is not encroached upon or injured; although he will not, as against the oyster planter, estop himself to improve at his pleasure except by his own consent duly and clearly given. There is moreover in the act regulating the deposit of materials in tide waters (sec. 936, Rev. Stat.), no recognition of any greater right in the riparian owner than we have conceded to him.

We find in the opinions of our own court outside of one or two general expressions nothing that can be regarded as hostile to the conclusion we have reached, and certainly nothing that in view of the facts of these cases can be taken as committing the court, as then constituted, to a contrary view. It is moreover a fact that in some of the opinions there are expressions which indicate a tendency to the views we have here announced, as in Rivas and Koopman vs. Solary, where it is said that the interest of the State which passed under the riparian act was "subject to the trust that it was to be used for the purpose of commerce as stated in the statute;" and in Apalachicola Park case, where it was said by Judge Maxwell that "if used at all it must be used for the benefit of commerce in the erection of wharves, warehouses and other buildings." And when it is said in Rivas. and Koopman vs. Solary that the right to build wharves "was an incident to the proprietorship," the meaning of the court was that the right to build appertained to the ownership of the part of the submerged land on which it might be proposed to build, and could not exist independent of that ownership, or in the owner of the highland, or of any other part of the

submerged land; but it was not meant that this use of the submerged land was not the use to which the statute had limited the ownership of the land granted, so long as it remained submerged. It was never intended that these submerged lands should be used for the erection of hotels, or opera houses, or mere stores of trade, nor in many other ways that might be designated, but only that they, while in their natural state, should be used in the manner specially defined by that statute. No warrant or authority for any other use is to be found in the act, and the view that any other use is permissible is entirely irreconcilable with the rule controlling in all cases of public grants, that the public can not be held to have parted with any right that is not expressly granted, or of which a grant is clearly implied.

The facts of this case, in that the riparian owner is taking phosphate in front of its own lands, render entirely unnecessary any decision of the question which might arise if permission had been given under the the phosphate act of 1891, to one not a riparian owner, and the owner claiming the benefit of the riparian act was opposing the former's exercise of the right in front of his lands. Here the riparian owner is not exercising any right given him by the riparian statute, but is doing what he is not permitted to do without the consent of the State, and is moreover refusing to comply with the terms prescribed by the State as a condition precedent to his doing it.

As to the contention that the lands of appellee do not extend to "low water mark," and hence are not within the beneficial purposes of the statute, our conclusion, without further defining the last clause of the second section of the riparian act, is that these lands are dry lands lying on the bank of the usual bed of

the navigable waters of the stream, washed by the flow of its waters at their ordinary stage and extending down to such waters at such stage, the company is within the statute at least as to all such lands of which there was private ownership at the time of the approval of the riparian statute.

The view we have taken of the case relieves us from settling what is meant by the term channel, as used in the riparian act, and from saying whether or not the statute extends its benefits simply to those who were riparian owners when it became a law, or also includes those who have subsequently become such by acquisition from the State or United States of lands bordering on navigable waters; and from construing the term "low water mark" used in the second section further than is done above.

The objection that the supplemental bill, which is brought in the name of the State suing by its Attorney-General, as was the original bill, is not properly brought because of certain provisions of the phosphate act of 1891, is untenable. That act gives the Board of Phosphate Commissioners the control and management of the phosphate interests of the State, in the beds of her navigable waters, and of all the phosphate therein which may be dug, mined and removed therefrom, to the extent of the State's interest, and also, *inter alia*, authorizes the board to institute all suits and legal proceedings in the name of the State, which may be necessary to protect the rights and interests of the State and to enforce the collection of all moneys due, or which may become due to it on account of phosphate dug, mined or removed from her navigable waters, giving them authority to employ counsel at such reasonable compensation as in their opinion is right and proper. Conceding for the purpose of this

case that its further enforcement became subject to the discretion of the board upon their appointment under the act of 1891, we fail to see anything in the act requiring an affirmative showing that it is continued with their consent, or according to their will, or rendering its form improper even as an original proceeding by them. It is the State's suit, brought originally by her Attorney-General, and the record affirmatively shows that he and his associate counsel have been assisted in its practical procedure by, the Inspector of Phosphates, an appointee of the board, and its "executive officer." We moreover do not think the supplemental bill introduces a new subject-matter of suit, but merely the continuation of the same trespassing since the commencement of the suit, in the bed of Black creek.

The decree will be reversed, and the cause remanded for proceedings not inconsistent with this opinion.

MABRY, J.:

There are views expressed in the opinion of the court prepared by the Chief Justice in construing the riparian act of 1856 in which I am unable to concur. The theory of construction as applied to the act does not seem to me to be the correct one. That this act is valid is conceded. It has been recognized as valid in several decisions of this court, and in one—Rivas and Koopman vs. Solary, 18 Fla., 122—it has to some extent been construed on a state of facts making a construction proper. Conceding that the respondent, the Black River Phosphate Company, is entitled to the benefit of this act

9

that is, that its proprietorship of lands bordering on Black river, a navigable tide water stream, brings it within the benefits of the act, a consideration of the act becomes proper.

It is unquestionably true that the grant should receive a strict construction as against the grantees, and nothing should be held to pass from the State that is not clearly within the meaning and terms of the grant. This is the general rule of construction applicable to the usual grants from the sovereign, and the nature of the property which is the subject of the grant under consideration, as will be further seen, makes the rule strictly applicable here. That the State of Florida in her sovereign capacity was, at the date of the act of 1856, the owner of the land mentioned in the act is beyond question. Judge Westcott says in Sullivan vs. Moreno, 19 Fla., 200: "Anterior to the act of 1856, Chapter 791, laws of this State, the title to the soil of navigable tide waters to the line of ordinary high tides was in the State of Florida, subject to the powers of Congress in the matter of regulating commerce under the Constitution of the United States. This, as a legal proposition, has been admitted as settled since the case of Pollard's Lessee vs. Hagan, 3 How., 299." This title, it is admitted, as shown by ample authority is not held by the same character of tenure that the State holds her ownership in the lands that constitute a part of the public domain, but it is held in trust for certain public purposes. These public purposes or uses for which the land covered by water and the shores bounding the same, are held, so far as I can ascertain from the decisions of the courts, grow out of the use of the water. These public rights are mentioned as relating to commerce and the rights of navigation, fishing and bathing, and they appertain to the

water and belong to the public generally without discrimination. The title to the shores and beds of navigable waters, being held in trust for the public uses mentioned, is subservient to and subordinate to such uses. The Legislature can not destroy or take away such rights by simply divesting the State of the legal title to the lands covered by water. They would still exist as long as the water of the navigable stream remained. While it is true that the title to the shores and beds of navigable waters, whether held by the State, or an individual citizen, is subservient to and subordinate to the public rights of commerce, navigation and fishing, the authorities also sustain the view that the State in her sovereign capacity, can vest in the citizen absolute ownership of parcels of such trust property, and authorize him to that extent to replace the *jus publicum*, when the parcels can be granted without detriment to the public interest in the waters and land remaining. The cases of Hoboken vs. Pennsylvania R. Co., 124 U. S., 656, and Illinois Central R. Co. vs. Illinois, 146 U. S., 387, are decisions bearing on this point. This reference is not made in support of the validity of the grant under consideration, for, as already stated, that is conceded, but for the purpose of stating all the existing conditions of the State's title at the time of the grant.

The title of the act is to benefit commerce. The inducements for the grant, or the ends to be accomplished by it, are expressed in a preamble to the act, and they are as follows: "Whereas it is for the benefit of commerce that wharves be built and warehouses erected for facilitating the landing and storage of goods; and whereas the State being the proprietor of all submerged lands and water privileges within its boundaries, which prevents the riparian owners from improving

their water lots; therefore" for these considerations the grant is made. Giving due consideration to all the language we find in this act, as we must do, it seems to me that the Legislature had two ends in view as an inducement to the grant. These ends are clearly expressed to be the construction of wharves and warehouses to facilitate the landing and storage of goods, and to encourage riparian owners in improving their water lots. The one is as much within the legislative contemplation as the other. How these ends are to be accomplished, or the improvements are to be made will further appear upon a consideration of the terms of the grant itself. The language of the granting part of the act contained in the first section is exceedingly broad and indicates of itself no purpose on the part of the Legislature to impose any limitations upon the title granted otherwise than by those implied limitations that attach to such a grant on account of the trust character of the land granted. The granting terms are that the people of the State "divest themselves of all right, title and interest" to the lands mentioned, "as far as to the edge of the channel, and thereby vest the full title to the same" in the riparian proprietors named. So far there can be no reasonable ground for contention that there is anything in the granting language itself to indicate a purpose to limit the title granted, or even the uses of the land, the title to which is vested in the riparian proprietors. The State held the lands granted, however, in trust for the public purposes of commerce and the right of navigation and fishing in the waters covered by the lands, and these rights, so long as the water remains, are superior to the title to the lands thus granted. The broad grant of the full title given by the language of the act referred to above, if nothing more

was said, would then be subject to limitations, but they would be such as are implied from the nature of the estate granted, and which must not be disregarded in construing the statute. These implied limitations are referred to in this connection in order that they may never be lost sight of in construing the language of this grant. Down to the language of the grant above quoted, including the granting words, there is nothing to show that the Legislature designed to limit the grant by anything in the granting terms used, and unless something is found in the subsequent part of the act to have this effect, the granting words must have their proper and legitimate meaning and effect, subject only to the limitations, whatever they may be, arising out of the trust nature of the estate granted.

After granting or vesting the full title in the riparian proprietors as above stated, and in the same connection with the granting words, this further language is used: "Giving them the full right and privilege to build wharves into streams or waters of the bay or harbor as far as may be necessary to effect the purposes described, and to fill up from the shore, bank or beach as far as may be desired, not obstructing the channel, but leaving full space for the requirements of commerce, and upon lands so filled in to erect warehouses or other buildings." The right of the riparian proprietor to prevent encroachments by other persons upon the land granted, by bill in equity, or at law, and to maintain trespass for any interference with such property, and the confirmation to such proprietor of all improvements which had been made before the passage of the act upon submerged lands for the purposes therein mentioned, are also provided for in the act. As to this provision it can not of course be contended that because a remedy is given to prevent encroach-

ments upon, and interference with, the land granted, this will operate as a limitation upon the grant itself. The natural inference from this language is, that the Legislature not only conveyed the title, but provided a remedy to protect it.

Does the above quoted language of the grant limit of itself either the title or use of the land already granted? The vesting of the legal title to the lands covered by water in an individual, as has been stated, would not alone authorize him to replace the water, or do anything else in the water that did not belong of right to each individual of the community. The State's title was held in trust and subordinate to the public rights in the water, which we have seen are rights of commerce, navigation and fishing, and the bare transfer of the legal title to the citizen, would still leave him powerless to invade the navigable waters covering his land in such a way as to impair the rights of the public. To do this he would have to have legislative authority, and to the extent that the Legislature has power to replace the *jus publicum*, it may be conferred upon the citizen. It would then seem that the quoted language above, and referred to as limiting the use of the land granted, giving the grantees full right and privilege to construct wharves into the water and to fill up from the shore as far as may be desired, not obstructing the channel, but leaving full space for the requirements of commerce, confers additional rights than those given by the grant of the title. It authorizes the grantee of the legal title to invade the *jus publicum*, even to the extent of converting the space occupied by water into solid ground, and upon it to construct warehouses and other buildings. It seems to me that it is clear that this language was employed to confer this further

right to build wharves and fill in dirt into the water, and this is the right upon which it operates. The grant of one right coupled with a grant of another and different right is not limited by the latter. But is it correct to hold that the use of the land granted is limited by the language giving the riparian owner the privilege to build wharves and fill in into the nav-igable waters mentioned in the act? To construe this language as a limitation upon the title vested in the riparian owner or his use of the land granted to him, it seems to me, would be to admit that, without this language, other uses of the lands granted equally as destructive of the *jus publicum*, as those given by it would exist. If it operates as a limitation upon other uses of the lands than those given, then such uses without the limiting terms must exist upon which it can operate. But it is certain, I think, that so far as the right to fill in, and thereby completely destroy the public uses in the water, is concerned, the riparian proprietor though vested with the title to the land covered by the water, in the absence of the language giving such right, would not have it. The grant of the privilege to the riparian owner contained in the language under consideration, was something in addition to the grant of the legal title, and was employed by the Legislature for this purpose. So that view of the opinion that the terms of the statute other than those vesting the title were put there to limit and qualify the rights of the riparian owner and preserve to the public every right not clearly expressed by them or necessarily implied by their meaning, is more than I am willing to accept. The effect of this grant was, I think, to vest the legal title in the riparian proprietors, subject to the public trusts attaching to such a title, coupled with the privilege of building wharves into

streams or waters of the bay or harbor as far as may be necessary to effect the purposes of landing and storage of goods, and also to fill up from the shore, bank or beach as far as may be desired, not obstructing the channel, but leaving full space for the requirements of commerce. The title is given by the statute, and when the water is replaced by the improvements authorized by the statute, the estate is absolute and relieved of any servitude to the public. It is true in my judgment that the riparian owner has no more right to disturb or invade the water covering his land, except for the purposes mentioned in the statute, than any other individual of the community, but this is not because the Legislature has limited him to such rights by granting to him the privilege of building wharves into the waters of navigable streams and filling in from the shore so far as not to interfere with commerce. It results from the nature of the estate which he holds, which, as above stated, so long as the water remains over it, is subject to the public use of navigation, fishing, bathing, etc. My view is that under the act of 1856 alone the State is in no condition to call upon a riparian owner to account for phosphate taken out of the beds of navigable streams out to the edge of the channel. The legal title in the soil covered by the water to the edge of the channel is undoubtedly in the riparian owner, and however limited may be his legitimate use of the water, or the soil thereof, so long as the full title as expressed in the act is in the abutting owner, the State is without a proper status in court, and can not successfully claim to be the proprietor of the phosphate which is a part of the soil in the bed of the stream. The State might on proper showing enjoin the riparian owner from disturbing the public rights in

the water in the way or for purposes not authorized
by the statute; but the theory of the State's case
here is that the riparian owner shall account for the
phosphate taken from the entire bed of the stream in
the part to the edge of the channel, as well as in the
channel.    We have held in the case of State *ex rel*.
Peruvian Phosphate Co. vs. Board of Phosphate Com-
missioners, 31 Fla., 558, 12 South. Rep., 913, that
by the act of 1891, Chapter 4043, the State has unmis-
takably asserted a right to the phosphatic deposits in
the beds of navigable streams and waters of the State,
even as against the riparian owner.   I believe that
since the act of 1891, the State can demand and col-
lect even from riparian owners the tonnage required
by that act for the privilege of digging for phosphate
and phosphatic deposits in the entire beds of naviga-
ble streams.   I do not believe the State would have
such right under the act of 1887, Chapter 3826.   This
is an act granting to H. S. Greeno and his associates
the right to dig and remove from the beds of the navi-
gable streams and waters in the State for a certain
period and for a certain compensation, the phosphate
rocks and phosphatic deposits therein, provided they
shall not in any way interfere with the free navigation
of the navigable streams, or the private rights of any
citizen residing upon or owning the lands upon the
banks of said streams and waters.   The Legislature
did not, in my judgment, intend by this act to assert
any such rights to the phosphate deposits in the beds
of navigable streams, as against the riparian owner, as
to authorize a suit for them, and the proviso in the
first section of this act relieves its language from such
effect, if it would have such without the proviso.

So long as the lands granted remain submerged,
the trust character of the title attaches, and the gov-

ernmental control over it is not lost. In the exercise of such control the legislation of 1891 over the beds of navigable streams will, I think, place the State in the position to demand the tonnage there prescribed for digging in the beds of navigable streams and waters in this State.

My view of the case calls for a consideration of what is the channel of Black river, and whether or not the appellee dug any phosphate out of it prior to the passage of the act of 1891, and also whether or not the State has any status in this case by filing the supplemental bill demanding an account for phosphate dug since the act of 1891 went into effect, but I do not deem it necessary to go into these questions. The opinion does not undertake to deal with them, and no difference of opinion would probably exist in reference to them.